Demetrius J. PETERSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–02–01226–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

April 29, 2004.

Jay Robert Brandon, San Antonio, TX, Robert Morrow, Hocker & Morrow, Boyd & Mathews, Spring, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Lori Deangelo Fix, Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices NUCHIA, TERRY JENNINGS, and KEYES.

## OPINION

TERRY JENNINGS, Justice.

A jury found appellant, Demetrius J. Peterson, guilty of the first degree felony offense of intentional injury to a child[1] and, after finding that a deadly weapon was used or exhibited in the commission of the offense, assessed appellant's punishment at confinement for 50 years. In three issues, appellant contends that (1) the evidence was factually insufficient to prove that he intentionally injured the child by burning her, (2) the evidence was legally insufficient to prove that he injured the child with his "hands, feet, or an unknown object," and (3) the trial court erred in admitting a photograph depicting a medical procedure performed on the child. We affirm.

### Facts and Procedural Background

Shavondra Grant testified that, in January 2002, appellant, who was her boyfriend, lived at her apartment with her and her two-year-old daughter, Jazmyn Grant–Bonar, the complainant. Appellant, who was unemployed, agreed to watch Jazmyn during the day while Grant worked. Grant believed that appellant treated Jazmyn as if she was his own daughter, and Grant felt comfortable entrusting Jazmyn to appellant during the day. Grant noted that appellant expressed frustration at the fact that Jazmyn was not yet completely potty-trained and would "pop" her on the back of her leg or bottom if she had an "accident."

On their first night at the apartment, Grant noticed that the water that ran out of the bathtub water tap was very hot, even when the faucet was turned to the "warm" position. Grant explained that she had learned this when she had accidently scalded her toes stepping into a hot bath that she had drawn. On that same night, Grant told appellant about the problem with the bathtub water temperature.

On the evening of January 15, 2002, Grant undressed and bathed Jazmyn in preparation for bed, and, at that time, she did not see any bruises or signs of injury on her daughter. She also described the child as talkative and playful.

The following morning, appellant drove Grant to work and returned home with Jazmyn. Sometime after her lunch break, Grant's supervisor told her that appellant had come to see her at her office.[2] When Grant saw appellant's face, she could tell that something was wrong. Grant asked appellant if anything was wrong, but he told her only to follow him outside. Grant followed appellant to his car and saw her daughter lying "slumped down" in the front seat, moaning softly and blinking her eyes. Notably, Jazmyn did not run or

1. See Tex. Pen.Code Ann. § 22.04(a), (e) (Vernon 2003).

2. At trial, Grant testified that appellant had arrived at her office at approximately 12:30 p.m. However, in a statement given to the police four days after these events, Grant had estimated appellant's arrival time to have been approximately 1:15 p.m.

jump up to see her, and, instead wearing the pink "onesie" in which Grant had dressed the child that morning, she was wearing a long-sleeved shirt and denim jumper. Grant also noticed that Jazmyn had a small, red mark on her forehead, which mark had not been present that morning.

When Grant asked appellant what had happened to Jazmyn, appellant said "[s]he fell running to the potty and hit her head." Grant then insisted that they take Jazmyn to a hospital, but appellant initially resisted. After Grant argued with appellant and told him that she intended to call an ambulance, appellant agreed to drive them to Bellaire Hospital. When Grant asked appellant why he had not called an ambulance or emergency assistance for the child earlier, appellant responded, "What do I look like, calling an ambulance?"

On the way to the hospital, Grant again asked appellant what had happened to Jazmyn. Appellant explained that, as the child "was getting on the potty, her foot slipped and she fell and hit her head." Appellant told Grant that he then picked Jazmyn up and put her in the bathtub because she had soiled herself. Grant noticed that the child's feet were pale and wrinkled, as if they had been in water for a long time. As appellant drove to the hospital, his car broke down and some passersby helped appellant push the car to a service station. Appellant got Jazmyn some juice and was able to restart the car after "about five minutes." Before they arrived at the hospital, appellant asked Grant to tell the hospital personnel that she had been with Jazmyn when the injury had occurred. Grant testified that appellant told her "it wouldn't look right for him to say that he was at the house with my daughter by himself." Grant admitted that she agreed to lie for appellant and explained that she did so "[b]ecause I believed him."

Grant testified that it took them approximately 30 minutes to travel to the hospital. When they arrived at Bellaire Hospital, Grant registered Jazmyn as a patient and, after "about ten minutes," a nurse took them to an examination room in the emergency unit. Grant and appellant were asked to remain outside the room while a doctor examined Jazmyn. After Grant and appellant spoke with a doctor, appellant left the hospital to go to the apartment and get a change of clothes for Grant and Jazmyn because Jazmyn had defecated on Grant "four or five" times on the way to the hospital. Appellant never returned to the hospital and, to Grant's knowledge, never telephoned the hospital after he had left.

A doctor at Bellaire Hospital showed Grant that Jazmyn had a hand print across her face and bruises on her arms and abdomen, injuries that Jazmyn had not had that morning before Grant went to work. Sometime after appellant left the hospital, Grant told Jazmyn's treating physicians that Grant had not been at the apartment when Jazmyn was injured. When Grant informed appellant that she had told the doctors that she was not present when Jazmyn was injured, he said that he was not returning to the hospital "because [appellant] kn[e]w what they do to people like him in jail."

Frederick Phillips, a triage nurse at Bellaire Hospital, testified that he met with Grant after she arrived with Jazmyn and that he assessed Jazmyn's condition as "critical." Phillips described Jazmyn as "lethargic" and "limp," and he saw diarrhea "pour from the child ... like water." Phillips testified that Grant told him that Jazmyn had fallen in the bathtub and had hit her head approximately 30 minutes prior to arriving at the hospital. After speaking with Grant and assessing Jazmyn's condition, Phillips immediately took Grant

and the child to the critical care room and subsequently prepared a triage report. Although the report indicated that it was typed into the hospital's computer beginning at 3:40 p.m., Philips explained that he did not know at exactly what time Grant, appellant, and Jazmyn had arrived at Bellaire Hospital. Phillips also explained that, when he first saw Jazmyn, he did not suspect or realize that she had sustained burn injuries.

Jazmyn's condition did not improve at Bellaire Hospital, and she was subsequently transported by ambulance to Hermann Hospital. Dr. Julie McManemy of Hermann Hospital's pediatric emergency room testified that, when Jazmyn arrived at about 6:00 p.m., the treating physicians immediately noticed that Jazmyn was "very lethargic." The doctors also observed signs of burn injuries to Jazmyn's stomach, genital area, and lower legs, but did not immediately determine the extent of those injuries. Dr. McManemy described Jazmyn's skin on her lower extremities as blistered and "mottled" in appearance. Dr. McManemy also observed bruises on Jazmyn's chest, which, in her opinion, were likely the result of an adult "holding the child and squeezing." As a result of her burn injuries, Jazmyn was "severely" dehydrated. As the doctors at Hermann Hospital gave Jazmyn intravenous fluids to treat her dehydration, her burn injuries began to blister further and worsen. Dr. McManemy estimated that, in her opinion, Jazmyn had sustained second- and third-degree burns over 30 percent of her body. To treat Jazmyn's burns, doctors removed the dead tissue, cleaned the injured areas of her legs and feet, and dressed her wounds.

In Dr. McManemy's opinion, Jazmyn's burn injuries were caused by abuse, were not accidental, and constituted "serious bodily injuries." Dr. McManemy based her opinion on the "sharp line of delineation" across the child's abdomen that separated the areas of her burned skin from the uninjured skin, which was consistent with the child's having been held in scalding water. In her opinion, such injuries would be "extremely painful," and anyone sustaining such burn injuries would instantly scream or cry out.

Jazmyn was subsequently transferred to the Shriners Hospital burn unit in Galveston for further treatment of her burn injuries. Dr. Stephen Wolf, a board-certified surgeon and faculty member of the University of Texas Medical Branch at Galveston (UTMB), testified that he was involved in treating Jazmyn at Shriners Hospital. When Jazmyn arrived, the doctors at Shriners Hospital determined that she had sustained injuries to her head, internal injuries to her liver and one of her kidneys, and second- and third-degree burns to over 35 percent of her total body surface area, covering almost the entire area of her lower extremities and extending up onto her abdomen and back. Dr. Wolf noted that certain areas of Jazmyn's lower extremities, including the backs of her knees and folds along her upper groin area, were not burned. This "sparing" pattern was, in his opinion, consistent with the child's having flexed her legs up to avoid contact with scalding water. Dr. Wolf explained that Jazmyn's burn injuries, because of the clear "line of demarcation" of the abdomenal burn, were inconsistent with the types of injuries that would appear had the child been "splashing around" in a bathtub. In fact, the burn injuries were more consistent with the child's having been held in scalding water.[3]

3. Dr. Wolf also testified that Jazmyn's internal injuries were "probably not" the result of a fall, but were more consistent with the child's having been struck with a blunt object or punched or kicked by an adult.

Dr. Wolf estimated that a child would sustain deep second-degree burns if the child was held in water heated to a temperature of 120 degrees Fahrenheit for approximately one minute. Dr. Wolf admitted that, because an adult can generally tolerate higher water temperatures, it would be possible for a child to receive a burn injury from water that would not immediately burn an adult. However, Dr. Wolf also testified that a child who sustained deep second-degree burns from being held in scalding water would experience "very, very, very intense pain" and would normally express such pain by crying and screaming.

Jazmyn remained at Shriners Hospital for several days. The doctors performed excision and skin-grafting procedures to treat her burn injuries, but Jazmyn "coded" twice and died as a result of her burn injuries.

Galveston County Deputy Medical Examiner Dr. Charles Harvey testified that he assisted in performing the autopsy on Jazmyn. Dr. Harvey, who is board certified in anatomic, clinical, and forensic pathology, explained that Jazmyn had "a traumatic burn pattern" present on the lower half of her body, with the exception of areas of sparing, which was consistent with the child's having been placed in hot water and then flexing her legs upward defensively. Dr. Harvey described the child's abdomen as having a pattern of burn injuries that appeared to be "almost a straight line indicating the level of the water in which she was immersed." Dr. Harvey noted that a child would sustain third-degree burns if held in water heated to a temperature of 130 degrees Fahrenheit for a minimum of 30 seconds and in water at a temperature of 125 degrees for

a minimum of two minutes. Based on his autopsy investigation, Dr. Harvey determined that Jazmyn's death was caused by "complications of acute scalding injury." He explained that, as a result of the shock and trauma that Jazmyn had sustained from her severe burn injuries, she experienced a "multi-organ failure" that eventually caused her death.[4] Dr. Harvey also noted that the fact that the medical personnel were not immediately aware of the nature of Jazmyn's burn injuries "vastly contributed" to her death.

Dr. Hal Hawkins, a board-certified pathologist and professor of pathology at UTMB, testified that he performed the autopsy on Jazmyn. In Dr. Hawkins's opinion, Jazmyn's burn injuries were "a typical example of intentional immersion" in scalding water.

Dr. Paul B. Radelat, a board-certified pathologist and expert witness retained on behalf of appellant, testified that he had practiced pathology for approximately 30 years and that, in preparation for his testimony, he had reviewed Jazmyn's medical records, autopsy report, and autopsy photographs. When questioned concerning whether, in his opinion, Jazmyn's injuries were accidental or abusive, Dr. Radelat considered them to be "possibly accidental, possibly abusive." Dr. Radelat noted that an adult would sustain third-degree burns if the adult placed his or her hands in water heated to 130 degrees Fahrenheit for 30 seconds, and he further noted that, if a child was immersed in water heated to 130 degrees, the child would "probably" react by flexing its legs up and crying. Dr. Radelat conceded that he saw no "convincing" evidence of splash burns, which Jazmyn might have sustained had she fall-

---

4. Dr. Harvey also described Jazmyn's internal injuries as "totally inconsistent" with injuries that would have been sustained as a result of a fall. Based on his observations during the autopsy, Dr. Harvey concluded that Jazmyn had sustained "at least" two blows to the abdomen, given the widely separated pattern of her internal injuries.

en or been placed accidentally in hot water. Additionally, Dr. Radelat explained that it was more probable that the child had sustained her burn injuries approximately 30 minutes before she was taken to Bellaire Hospital.

Houston Police Sergeant J. Binford of the Homicide Division testified that he met with Grant at Hermann Hospital and later went with Grant to her apartment to investigate the cause of the child's injuries. Using a cooking thermometer that he had borrowed from a professional chef, Binford determined that the water temperature in Grant's bathtub could reach as high as between 122 to 132 degrees Fahrenheit. In Binford's opinion, "[n]o human being could comfortably place their hand in that water." Binford also met with and interviewed appellant and saw that appellant did not have any injuries to his hands.

Marilyn Peterson, appellant's sister, testified that she drove appellant to meet with a police officer and was present when he was interviewed by the officer. She recalled that appellant told the officer that, on the morning of January 16, 2002, as appellant was watching Jazmyn, the child had soiled herself. Appellant told the officer that, after he had spanked the child, he then saw her fall as she was attempting to climb up onto the toilet. Appellant stated that he had determined that Jazmyn was "all right" and had then drawn some water in the bathtub. Appellant claimed that he had "checked the water" before he put the child in the bathtub. Appellant further explained that, "When she got out of the bathtub, she was weak, and that's when I went and got her mother."

### Sufficiency of the Evidence

In his first issue, appellant argues that the evidence was factually insufficient to "prove appellant injured the child by intentionally burning her, because there was no evidence of intent, and appellant did not have exclusive possession of the child at the time she could have been burned."

We review the factual sufficiency of the evidence by examining all of the evidence neutrally and by asking whether the evidence, both for and against the finding, demonstrates that the proof of guilt was so obviously weak as to undermine confidence in the jury's determination, or whether the proof of guilt, although adequate if taken alone, was greatly outweighed by contrary proof. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000).

A jury may infer intent from a defendant's conduct and the surrounding facts and circumstances. *LaPoint v. State,* 750 S.W.2d 180, 182 (Tex.Crim.App.1986); *McGee v. State,* 923 S.W.2d 605, 608 (Tex. App.-Houston [1st Dist.] 1995, no pet.). Here, the overwhelming weight of the medical and fact witness testimony contradicts appellant's argument on appeal that "there was no evidence of intent." Appellant admitted to Grant and later to the police, in the presence of his sister, that he had bathed Jazmyn that morning. Sergeant Binford testified that he measured the temperature of the water in the apartment's bathtub and that it could reach as high as between 122 to 132 degrees Fahrenheit. Dr. McManemy, Dr. Wolf, Dr. Harvey, and Dr. Hawkins all testified that the nature and appearance of Jazmyn's burn injuries indicated that she had been held in water heated to a temperature of at least 120 degrees Fahrenheit for a sufficient period of time to cause severe second- and third-degree burns. These doctors also testified that a child held in water at this or higher temperatures would react immediately and strongly from the pain caused by such burns. Only appellant's expert, Dr. Radelat, equivocated on the issue of whether Jazmyn's burn injuries were "possibly accidental."

With regard to appellant's contention that he did not have exclusive possession of Jazmyn at the time that she sustained her burn injuries, appellant argues that the evidence was factually insufficient to support his conviction because of a "mysterious time gap in the State's case." As noted above, Grant testified that (1) appellant picked her up from work sometime shortly after her lunch break, (2) they took Jazmyn to Bellaire Hospital, (3) along the way appellant's car stalled, but was repaired within 30 minutes, and (4) they arrived at the hospital and were seen by medical personnel shortly after arriving. Appellant argues that, given Grant's testimony, Grant, appellant, and Jazmyn should have arrived at Bellaire Hospital much sooner than the time entry noted on the report prepared by the nurse at Bellaire Hospital: 3:40 p.m. Appellant's medical expert, Dr. Radelat, testified that Jazmyn's injuries "probably" occurred approximately 30 minutes before she was treated at Bellaire Hospital. Appellant contends that, because he did not have exclusive possession of the child during this time "gap," it was equally possible that Grant had inflicted the burn injuries on Jazmyn.

However, the nurse also testified that he did not know at what time appellant, Grant, and Jazmyn had arrived at the hospital and that the time noted on his report indicated only the time at which he had begun typing. Moreover, Grant and appellant's sister testified that appellant admitted to having bathed the child that morning. Grant also testified that, on the way to the hospital, appellant asked Grant to lie to the medical personnel at the hospital and to tell them that Grant had been present when the child was injured. After taking Grant and the child to the hospital, appellant then left and did not return.

The jury was in a position to view the testimony and judge the credibility of the witnesses during the trial. As the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given their testimony, the jury was free to believe or disbelieve all or any part of any of the witnesses' testimony. *See Jones v. State,* 944 S.W.2d 642, 647 (Tex.Crim.App. 1996); *McKinny v. State,* 76 S.W.3d 463, 468–69 (Tex.App.-Houston [1st Dist.] 2002, no pet.). We will not hold the evidence factually insufficient merely because a defendant offers an explanation of the facts that is different from the explanation offered by the State. *See Russell v. State,* 665 S.W.2d 771, 776 (Tex.Crim.App.1983).

Viewing all of the evidence neutrally, we hold that the jury could reasonably have concluded that appellant, and not Grant, was the person who had intentionally injured Jazmyn by holding her in hot water and that the evidence on which the jury based its verdict was not greatly outweighed by contrary evidence. Accordingly, we hold that the evidence was factually sufficient to support appellant's conviction for intentional injury to a child.

We overrule appellant's first issue.

In his second issue, appellant argues that the evidence was legally insufficient "to prove appellant injured the child with his hands, feet, or an unknown object, because the time the injuries occurred was not proven, and appellant did not have exclusive possession of the child during the time the injuries could have occurred."

Here, the jury returned a general verdict, finding appellant guilty "as charged in the indictment." Because we have held that the evidence was factually sufficient to support appellant's conviction for intentional injury to a child under the theory that appellant caused the child to sustain severe burn injuries by intentionally holding her in hot water, we need not consider the sufficiency of the evidence to support his conviction under the other theories

charged by the State. *See Pinkerton v. State*, 660 S.W.2d 58, 62 (Tex.Crim.App. 1983).

Accordingly, we overrule appellant's second issue.

### Admission of Photograph

■ In his third issue, appellant argues that the trial court erred in admitting into evidence, over appellant's objection, State's exhibit number 61, which was a photograph depicting the severe burn injuries to Jazmyn's lower extremities and doctors at Shriners Hospital preparing to debride burned skin from Jazmyn's legs. Appellant argues that the prejudicial effect of the photograph outweighed its probative value, if any, and that the photograph should have been excluded from evidence.

Admission of potentially prejudicial evidence is governed by Texas Rule of Evidence 403. TEX.R. EVID. 403. In determining whether such an exhibit was properly admitted, the pertinent question is not whether the exhibit was more prejudicial than probative, but rather, whether the probative value of the exhibit was substantially outweighed by the danger of unfair prejudice. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex.Crim.App.2001). We review a trial court's Rule 403 decision for an abuse of discretion, meaning we will reverse the decision only if it is outside the zone of reasonable disagreement. *Id.*

■ In regard to photographs, a trial court, in conducting its Rule 403 analysis, must consider the factors affecting a photograph's probativeness and must balance those factors against the tendency, if any, that the photograph has to encourage resolution of material issues on an inappropriate emotional basis. *Id.* at 152 (citing *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim.App.1999)). In making its determination concerning the proclivity of a picture to spur emotional decision making, the court should examine several factors, including "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, [and] whether they are close-up." *Long v. State*, 823 S.W.2d 259, 272 (Tex.Crim.App. 1991).

■ As the Court of Criminal Appeals has noted,

Additionally, relevant criteria in determining whether the prejudicial effect of a piece of evidence substantially outweighs the probative value include the fact "that the ultimate issue was not seriously contested by the opponent; that the State had other convincing evidence to establish the ultimate issue to which the [evidence] was relevant; that the probative value of the ... evidence was not, either alone or in combination with other evidence particularly compelling; that the [evidence] was of such a nature that a jury instruction to disregard it for any but its proffered purpose would not likely be efficacious."

*Salazar*, 38 S.W.3d at 152 (quoting *Reese v. State*, 33 S.W.3d 238, 241 (Tex.Crim. App.2000)).

Here, in order to prove that appellant had committed a first degree felony, the State was required to prove that Jazmyn had sustained a serious bodily injury.[5] Of the numerous photographs admitted, only State's exhibit 61 depicted Jazmyn's injuries, not covered by bandages, while she was still alive. Thus, State's exhibit 61 was probative. *See Fuller v. State*, 829 S.W.2d 191 (Tex.Crim.App.1992) (noting that degree to which proponent of evidence will be disadvantaged without evidence at issue is factor affecting probativeness).

---

5. *See* TEX. PEN.CODE ANN. § 22.04(a)(1), (e).

As noted by appellant, State's exhibit 61, although in color, was not a close-up photograph and was approximately three inches by three and one-half inches in size. We do not disagree with appellant's contention that State's exhibit 61 was graphic, but it was so only to the extent that it accurately depicted the severe burn injuries sustained by Jazmyn on her lower extremities. We note that, immediately prior to the admission of the photograph, Dr. McManemy testified, without objection, as to the medical procedure that the doctors were performing or were preparing to perform on the child. Moreover, on appeal, appellant does not challenge the trial court's admission into evidence of the several other, more graphic, photographs that depicted the nature and extent of the child's burn injuries as seen at the time of her autopsy. Given the circumstances of this particular case, we hold that the trial court did not abuse its discretion in deciding that the probative value of State's exhibit 61 was not substantially outweighed by the danger of unfair prejudice.

We overrule appellant's third issue.

### Conclusion

We affirm the judgment of the trial court.