**Opinion issued February 28, 2023**



In The

# Court of Appeals

For The

## First District of Texas

———————————

### NO. 01-21-00641-CR

———————————

**JULIE MICHELLE STASTNY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 155th District Court**
**Austin County, Texas**
**Trial Court Case No. 2020R-0027**

---

### MEMORANDUM OPINION

Appellant Julie Michelle Stastny was convicted of intentionally or knowingly causing bodily injury to her ten-year old son, J.K.[1] In five issues on appeal, Stastny argues: (1) the trial court violated her constitutionally protected right to a public trial,

---

[1] *See* TEX. PENAL CODE § 22.04(a)(3).

(2) the trial court erred in denying her motion for judgment notwithstanding the verdict because the evidence is insufficient to support a finding that she intentionally or knowingly injured her son, (3) the trial court erred in allowing the introduction of outcry witness testimony, and (4) her trial counsel was not permitted to rehabilitate a potential juror.

We affirm.

**Background**

J.K. and his friend D.D. were at Stastny's home for a sleepover on January 3, 2020. The boys were upstairs in J.K.'s room playing video and computer games. At one point that evening, J.K. testified that Stastny and D.D. were play fighting, but things "progressively got worse," and the boys tried to leave J.K.'s room. J.K. testified that they told Stastny they wanted out of the room, but Stastny would not let them leave and blocked the doorway to his room. D.D. tried to hide in the closet to keep Stastny from hurting him. J.K. texted his grandmother, Jean Stastny, telling her that Stastny was "trashing [his] room" and hurting him, and asked Jean to pick him and D.D. up. In addition to physically blocking the boys from leaving the room, J.K. testified that Stastny picked him up and dropped him on the floor, causing him to hit his arm on the side of his bed. J.K. described being dropped as feeling like "hit[ting] your knee on concrete . . . [a] sharp pain." J.K. testified that he tried to get away from Stastny, but she grabbed him by the leg, and he fell, hitting the side of

his head. J.K. tried to get away from Stastny again, but she grabbed him by the leg, held him down on the ground, and bit his calf through his pants.

Jean arrived at Stastny's house quickly because she lived nearby. When she arrived, she saw both boys, who looked afraid, at the top of the stairs trying to get past Stastny. Jean asked Stastny what was going on, and Stastny responded by saying, mockingly, "Jean, what is going on?" Jean testified that Stastny seemed intoxicated and was slurring and repeating words. D.D. was able to run downstairs past Stastny to get to Jean's car, but as D.D. tried to get past, she grabbed his arm and "held him very tight" and said: "If you think I put bruises on you, show them to me, because you need to be a lot tougher than you are." The boys were able to get into Jean's car and she dropped D.D. off at his nearby home with his mother, Dezarrie Mauldin, before taking J.K. back to her house. When Jean arrived home with J.K., he had "tears rolling down his face and he was very terrified looking." J.K. told Jean that he and Stastny "were wrestling on the floor, and that she was holding him down; and at some point, he . . . fell into the door facing and got the bruise that was on the side of his face." J.K. also told Jean that Stastny held him down on the floor and bit him on the back of the leg.

Dezarrie testified that D.D. seemed "shooken up" when he came home. She testified that Stastny called her that night and "cussed [her] out on the phone." Stastny told Dezarrie that the whole incident was just an accident, that they were

3

"just playing," and then called Dezarrie a "bitch" and hung up on her. Dezarrie called the police to report the incident.

After Dezarrie called the police, Sergeant J. Fullen and Officer I. Tapia with the Sealy Police Department came to her house and began their investigation. Officer Tapia testified that D.D. and Dezarrie were concerned about what had happened, so they went to talk to J.K. and Jean. When they arrived at Jean's house, the officers saw a bruise on J.K.'s face and Officer Tapia observed the bite mark on J.K.'s calf under his pants. Both officers testified the injuries were consistent with bodily injury.

Sergeant Fullen testified that his main concern was J.K.'s safety, because "[t]here was nothing keeping [Stastny] from coming back for him, if [they] did not apprehend her for a criminal charge." Accordingly, the officers went to Stastny's home that night and arrested her. When the officers arrived at Stastny's house, she was intoxicated and belligerent, she was unable to maintain her balance, and her speech was incoherent.

A few days after the incident, Stastny gave a statement to Detective A. Manies, with the Sealy Police Department. Detective Manies testified that, in her written statement, Stastny stated that she was "play fighting" with J.K. and D.D. when J.K. "accidentally hit his cheek on the doorframe." She stated that "everything stopped" after J.K. hit his cheek, and that J.K. insisted on calling his grandmother, Jean. Stastny stated that she did not intend to harm anyone and that they were only

4

roughhousing. Detective Manies testified that Stastny did not say anything about biting J.K.

The jury found Stastny guilty of injury to a child and sentenced her to five years' imprisonment.

## Public Trial

In her first issue, Stastny argues that the trial court violated her constitutionally protected right to a public trial because the livestreaming procedures put in place by the trial court due to the COVID-19 pandemic stopped working numerous times and, in at least one instance, the trial court continued the trial despite the livestream failure.

## A.    Standard of Review

Criminal defendants have a right to a public trial. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The right to a public trial is forfeitable and must be preserved by a proper objection at trial. *Dixon v. State*, 595 S.W.3d 216, 222–23 (Tex. Crim. App. 2020) (citing *Peyronel v. State*, 465 S.W.3d 650, 653 (Tex. Crim. App. 2015)). Preservation requires a timely, specific objection. TEX. R. APP. P. 33.1(a)(1)(A); *Dixon*, 595 S.W.3d at 223. The complaining party must also obtain a ruling on the objection, or absent a ruling, the complaining party must object to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2). As the appealing party, Stastny

had the burden to bring forth a record showing that error was preserved. *Dixon*, 595 S.W.3d at 223.

**B.     Analysis**

Following jury selection at the conclusion of the first day of trial, the State put on the record the following statement related to the agreed-upon trial procedures in place due to the COVID-19 pandemic:

> I believe the Court has designated the Christian City Fellowship as an auxiliary courthouse. And it's a facility that is outside of the county seat of Bellville, but that the Commissioners Court has also designated it as an auxiliary courthouse for the purposes of jury selection during Covid, since the Court right now is still under the Texas Supreme Court and Office of Court Administration Orders regarding social distancing, this facility has been agreed upon as a facility that is large enough and has the sound equipment and parking facilities necessary as the closest one to the County Seat that we could find that would be able to provide those facilities to the County, and have, conduct the jury selection here and tomorrow going forward, that is the plan, I believe, as the Court has discussed, is to have the jurors in the audience box instead of the jury box; so that they can socially distance in the audience section of the courtroom. And we will have witnesses facing them, and kind of have rearranged the courtroom to accommodate that. We have also set up a camera with a live feed to a basement meeting room, so if anyone from the public wishes to watch the trial, that is not under the rule, then they can view a live feed of the trial through that basement meeting room live feed, which has been set up.
>
> So that is my understanding of the agreed upon Covid procedures. I think also you, Your Honor, have designated this and through the Administrative Judge, as an auxiliary courthouse. So that is the procedure that we are working under right now.

The trial court agreed and noted that there were "no pretrial motions filed objecting to the use of this facility or . . . the anticipated procedures for this portion and/or the

6

evidentiary portion of the trial." The trial court then asked Stastny's counsel if there was anything the defense wanted to state concerning the COVID-19 operating procedures, to which defense counsel responded, "[n]o, judge."

Throughout the trial, there were a few instances when technical issues related to the livestreaming procedures arose. On one occasion, the trial court explained to the jury the purposes of the streaming equipment:

> All right. Ladies and gentlemen of the jury, what is going on with some of the other technical things here, because there is no public participation in the actual courtroom because of how we put you in the audience portion of the courtroom, the public viewing is available in the basement. So this is being streamed to the basement for any persons that would choose to watch this down in the basement. So that is what is going on with the laptop over there, the webcam, and things of that nature. So that is what's -- and we just realized we had a technical issue with it, which that has now been solved and so we may proceed. Thank you.

On another occasion, the trial court and counsel were alerted to an issue that only the video feed was streaming to the public viewing area, but no audio. Because no members of the public were currently in attendance, the trial court elected to continue with the trial, but required court staff to notify him if a member of the public arrived to view the trial.

STATE:       We need to approach about a technical issue.

(At the bench).

STATE:       We just got a message from Rebecca that there is video, but no audio downstairs in the basement. She also said that there are no spectators, so ...

THE COURT:    Okay. Let's keep on going and try -- where is Ben?

STATE:        He may have been trying to fix it.

THE COURT:    Oh, he already; knows about it?

STATE:        I don't know. I'm not sure. She said she didn't think anybody knew.

THE COURT:    Okay. Let's try and get Ben to do whatever -- and he can do whatever he needs to, you know, in here, but I think we can keep going, as long as there is no public trying to view it.

STATE:        I'll let Lisa know, if that's okay with the Court and Counsel, to tell Rebecca to text us if anybody does show up.

THE COURT:    She can call up here if something happens. Give her this extension. She should just call up if something happens. Now, if somebody comes in, and it's not fixed, then we need to know, too, but I think we can keep going at this point.

STATE:        Okay.

THE COURT:    All right. Thank you.

At no point during any of the above exchanges did Stastny object to the Covid procedures put in place or otherwise indicate her lack of consent to those procedures. Nor did she object at any time during the trial when technical difficulties arose, or when the trial court continued the trial even though audio was not being streamed to the public viewing area. Stastny never raised the objection that these procedures denied her the right to a public trial. Because Stastny failed to object, we hold that

8

she failed to preserve her argument that she was denied the right to a public trial. *See* TEX. R. APP. P. 33.1(a)(1)(A); *Dixon*, 595 S.W.3d at 222–23.

We overrule Stastny's first issue.

## Sufficiency of the Evidence

In her second and third issues, Stastny argues that the trial court erred in denying her motion for judgment non obstante veredicto (JNOV) because the evidence was legally and factually insufficient to prove that Stastny intentionally or knowingly caused injury to her son.

We initially note that it is well established that a trial court does not have authority to grant a JNOV in a criminal case. *State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996). When a case is tried by a jury, Article 42.01 of the Texas Code of Criminal Procedure requires that the judgment of the trial court reflect "[t]he verdict or verdicts of the jury[.]" TEX. CODE CRIM. PROC. art. 42.01, § 1(7); *see Savage*, 933 S.W.2d at 499. For this reason, the Court of Criminal Appeals held in *Savage* that a trial court does not have the authority to grant a different judgment— a judgment non obstante veredicto—than that rendered by the jury. *Savage*, 933 S.W.2d at 499. Texas courts have held that the trial court may not receive the jury's verdict and then enter a different judgment than the one called for by the jury's verdict. *Combes v. State*, 286 S.W.2d 949, 950 (Tex. Crim. App. 1956); *Dunn v. State*, 176 S.W.3d 880, 885 (Tex. App.—Fort Worth 2005, no pet.); *Chafin v. State*,

9

95 S.W.3d 549, 555 (Tex. App.—Austin 2002, no pet.). Once the jury has returned a guilty verdict and that verdict is read aloud in open court, the trial court is not authorized to then grant a motion for directed verdict and enter a judgment of acquittal. *See Savage*, 933 S.W.2d at 499; *Dunn*, 176 S.W.3d at 885; *Chafin*, 95 S.W.3d at 555. Therefore, we conclude that the trial court did not err in denying Stastny's motion for JNOV as any action by the trial court in entering a different verdict than the one returned by the jury would have been unauthorized and improper.

We turn to Stastny's sufficiency challenge.[2]

## A.     Standard of Review

Every criminal conviction must be supported by legally sufficient evidence as to each element of the offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316 (1979); *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). In a legal sufficiency review we consider all the evidence in the light most favorable to the verdict, and we decide whether a rational

---

[2]     Stastny appears to challenge both the legal and factual sufficiency of the evidence to prove she injured her son intentionally or knowingly. The Texas Court of Criminal Appeals has rejected the applicability of a factual-sufficiency review in criminal cases and instead held that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, we apply the legal-sufficiency standard as set forth in *Jackson*.

trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010).

The evidence may be circumstantial or direct, and juries may draw multiple reasonable inferences from the evidence presented at trial. *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). The jury is the sole judge of witness credibility and of the weight given to any evidence presented. *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). A jury may believe or disbelieve some or all a witness's testimony. *Penagraph v. State*, 623 S.W.2d 341, 343 (Tex. Crim. App. 1981). We presume that the jury resolved any conflicting inferences in favor of the verdict, and we defer to that determination. *Merritt*, 368 S.W.3d at 525–26.

**B.    Injury to a Child**

To sustain a conviction for intentional or knowing injury to a child the evidence must prove that a defendant intentionally or knowingly, by act or omission, caused bodily injury to a child fourteen years of age or under. TEX. PENAL CODE § 22.04(a)(3) ("A person commits an offense if he intentionally [or] knowingly . . . by act . . . causes to a child . . . bodily injury."). Injury-to-a-child offenses under Section 22.04 are "result-oriented" and "requir[e] a mental state that relates not to the specific conduct but to the result of that conduct." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"A person acts intentionally or with intent, with respect . . . to a result of [her] conduct when it is [her] conscious objective or desire to . . . cause the result." TEX. PENAL CODE § 6.03(a). A person acts knowingly, or with knowledge, with respect to the result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b). Mental culpability may be inferred from a defendant's conduct and the surrounding facts and circumstances. *Moore v. State*, 969 S.W.2d 4, 10 (Tex. Crim. App. 1998). Here, the State was required to prove Stastny intended to, or knew she would, cause bodily injury when she bit J.K. and "thr[ew] him with her hands" as alleged in the indictment.

## C. Analysis

Stastny argues that she was only playing with J.K. and his friend and she "had no intention of harming anyone." According to Stastny, she was merely "roughhousing" with the boys, and she did not have reason to believe this roughhousing "would necessarily result in injury that required the attention of law enforcement." She contends that because there was inconsistent testimony in the record as to the circumstances surrounding J.K.'s injuries, and affirmative testimony that she was playing with the children when J.K. was injured, no rational trier of fact could have found her guilty of intentionally or knowingly causing injury to J.K.

We disagree. Here, J.K. and D.D. both testified that Stastny held J.K. down and bit him on the leg. J.K. also testified that this occurred after Stastny had dropped

him on the floor, and after he told Stastny he wanted out of the room. Jean likewise testified that J.K. told her Stastny held him on the floor, would not let him get up, and bit him on the back of the leg. She testified that J.K. showed her the bite mark on the back of his leg, which she described as "a large, complete mouth imprint, a bruise." Additionally, Officer Tapia testified that he observed the bite mark on the back of J.K.'s leg, and pictures of the bite mark were introduced into evidence. This evidence of the bite inflicted on J.K. after he had already told Stastny he wanted to leave the room, that she prevented him from doing so, and that she then picked him up and dropped him on the floor, supports a finding that Stastny intentionally or knowingly injured J.K. by biting him. *See Moore*, 969 S.W.2d at 10 (noting mental culpability may be inferred from defendant's conduct and surrounding facts and circumstances); *see also Black v. State*, No. 01-11-00261-CR, 2012 WL 2106553, at *3 (Tex. App.—Houston [1st Dist.] June 7, 2012, no pet.) (mem. op., not designated for publication) (holding that testimony from appellant admitting to biting eleven-month-old child, from doctor who observed between seven and eight bite marks on child's body in various stages of healing, from witnesses that child had bites on large portion of his body, and from child's brother that child had cried after being bitten, was evidence of "more than bruising of an undetermined origin, and supports a finding that [appellant] intentionally or knowingly injured [child]").

13

Further, we reject Stastny's argument that the inconsistent testimony related to whether she had been "play fighting" or roughhousing with the boys means that no rational trier of fact could have found her guilty of intentionally or knowingly causing injury to J.K. Even if the jury had before it evidence that Stastny had been play fighting with the boys at some point that night, it also had evidence that the boys tried to leave the room, Stastny prevented them from doing so, and she dropped J.K. on the floor and caused him to trip and hit his face on the door frame, all before finally holding him down and biting his leg, which left a visible bruise. As the fact finder, the jury was able to evaluate the credibility of the trial witnesses. *See Peterson v. State*, 137 S.W.3d 739, 745 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). The jury was free to believe or disbelieve all or any part of any of the witnesses' testimony. *See Penagraph*, 623 S.W.2d at 343; *McKinny v. State*, 76 S.W.3d 463, 468–69 (Tex. App.—Houston [1st Dist.] 2002, no pet.). As an appellate court, we are not free to reject evidence as insufficient "merely because a defendant offers an explanation of the facts that is different from the explanation offered by the State." *Peterson*, 137 S.W.3d at 745 (citing *Russell v. State*, 665 S.W.2d 771, 776 (Tex. Crim. App. 1983)). And from the above evidence, the jury could have rationally inferred that Stastny intentionally or knowingly injured J.K. by biting him. Accordingly, as the only element she challenges on appeal is the required mental

state, we hold there is sufficient evidence to support Stastny's conviction for injury to a child.

We overrule Stastny's second and third issues.

**Outcry Testimony**

In her fourth issue, Stastny argues that the trial court erred in allowing the introduction of outcry witness testimony which only served to bolster the testimony of J.K.

**A.      Standard of Review and Applicable Law**

A trial court has "broad discretion" in admitting outcry witness testimony. *Garcia v. State*, 792 S.W.2d 88, 92 (Tex. Crim. App. 1990). We will not reverse the trial court's decision to admit outcry witness testimony unless it falls outside the zone of reasonable disagreement. *Buentello v. State*, 512 S.W.3d 508, 516–17 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

Article 38.072 of the Texas Code of Criminal Procedure permits outcry statements by certain victims of child abuse, including victims of assaultive offenses under Chapter 22 of the Penal Code, to be admitted during trial, so long as the rules of this statute are complied with, despite the hearsay rule. *See* TEX. CODE CRIM. PROC. art. 38.072. The statute applies to "statements that . . . describe . . . the alleged offense" and that:

> 1. "were made by the child . . . against whom the charged offense . . . was allegedly committed; and

15

2. "were made to the first person, 18 years of age or older, other than the defendant, to whom the child . . . made a statement about the offense."

*Id.* art. 38.072, § 2(a); *Polk v. State*, 367 S.W.3d 449, 453 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). The statement must be more than words which give a general allusion that something in the area of child abuse was occurring. *Garcia*, 792 S.W.2d at 91. The evidence must clearly show that the victim described the alleged offense in some discernible manner to the witness. *Id.*

## B.    Analysis

We disagree that the trial court abused its discretion in admitting the testimony of Jean Stastny, who was determined by the trial court to be the appropriate outcry witness.[3] The trial court conducted an outcry hearing outside the presence of the jury. At the hearing, Jean testified that she received a text message from J.K. on January 2, 2020, around 10:15 p.m. Jean stated that J.K. was at Stastny's townhouse in Sealy, which was "[j]ust a few blocks away" from Jean's house. In the text message, J.K. asked Jean to come get him because "[his] mom was hurting [him]." Jean drove to Stastny's house, and when she walked into the house, she saw Stastny

---

[3]    At the outset, we note that although Stastny purports to object to one (or more) witnesses testifying as outcry witnesses, she provides no citation to the record for the objected-to testimony. Nor does she identify the specific witness, the testimony that was objectionable or subject to exclusion, or any reason why such unidentified testimony should have been excluded, apart from the conclusory argument that it improperly "served to bolster the testimony of [J.K.]" For these reasons, Stastny has not properly briefed this argument. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to include "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

16

at the top of the stairs, saw D.D. at the railing at the top of the stairs, and saw J.K. standing at the entrance to his bedroom. J.K. said Stastny would not let them come downstairs. Jean testified that both boys looked afraid. Jean testified that Stastny appeared to have been drinking because her words were slurred when she talked. The boys were able to "scoot[] past" Stastny and get downstairs. Jean testified that she left with both boys and dropped D.D. at his parents' house.

After Jean dropped off D.D., Jean took J.K. back to her house, where he told her that "he was playing on his Xbox and his mom and [D.D.] were playing. And that at some point, I guess his mom, he was trying to explain that his mom was kind of upset with him and had wrecked his room, is how he explained it, by throwing things around or taking the covers off the bed." J.K. then told Jean that Stastny held him down on the floor and, during a struggle, he hit the door frame. Jean testified that J.K. also told her that Stastny held him on the floor and bit him on the back of his leg. Jean testified that J.K. lifted the leg of his pants and showed Jean a bruise and "an imprint of a full mouth" on the back of his leg. Jean further testified that J.K. told her multiple times that Stastny kept dropping him on the floor and hurting him. Jean confirmed that she was over the age of 18 at the time J.K. made these statements to her, and that J.K. was ten at the time of the incident.

Based on her testimony, Jean qualified as a proper outcry witness under Article 38.072 because she was over the age of 18, J.K. was under the age of 14, and

17

he described the abuse in a discernible manner to Jean. *See* TEX. CODE CRIM. PROC. art. 38.072; *Garcia*, 792 S.W.2d at 90–91. Stastny does not argue on appeal that Jean is not qualified to be an outcry witness, nor does she argue that some other witness should have been the outcry witness, instead of Jean. On the contrary, the only argument Stastny raises is that Jean's testimony improperly bolstered J.K.'s credibility. *See Guerra v. State*, 771 S.W.2d 453, 474 (Tex. Crim. App. 1988) ("'Bolstering' occurs when one item of evidence is improperly used by a party to add credence or weight to some earlier unimpeached piece of evidence offered by the same party."). But, as we have already concluded, Jean was appropriately identified as the proper outcry witness, and the jury heard directly from J.K. himself. The jury, therefore, was in the best position to judge J.K.'s credibility, despite Jean's outcry testimony. *See Rosales v. State*, 548 S.W.3d 796, 809 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (concluding outcry testimony was harmless because jury heard directly from victim and it was in best position to judge victim's credibility regardless of outcry testimony); *see also Medina v. State*, No. 10-18-00224-CR, 2020 WL 5938766, at *2 (Tex. App.—Waco Sept. 23, 2020, pet. ref'd) (mem. op., not designated for publication) (rejecting appellant's argument that admission of outcry testimony was harmful because it allowed State to improperly bolster victim's credibility because jury heard from victim directly and was in best

position to judge her credibility). Accordingly, we hold that Stastny has not shown that the trial court abused its discretion in admitting the outcry testimony from Jean.

We overrule Stastny's fourth issue.

## Rehabilitation of Potential Juror

In her fifth issue, Stastny argues that defense counsel was not given an opportunity to rehabilitate juror 126 before the trial court struck the juror for cause. According to Stastny, this error was of constitutional magnitude and requires reversal.

During voir dire, juror 126 stated that, based on her personal experience, she was leaning toward thinking that this offense, injury to a child, should not be a felony. Based on these statements, the State indicated it wanted to challenge juror 126 for cause, but wanted to question her further, resulting in the following exchange:

| THE COURT: | Okay. We just want to follow up with some of the answers you gave to make certain that we understand what you said or sometimes didn't say, for that matter. |
| --- | --- |
| VENIREPERSON: | Well, in fact, let me say something. |
| THE COURT: | Let's keep our voices down. We are trying to have a private conversation up here. |
| VENIREPERSON: | Something that I didn't say but that I feel, a two year minimum seems like a very harsh sentence for what I have heard so far. Now, maybe the evidence is way worse than what |

19

I've heard so far, but what I'm hearing so far, this seems overly severe.

THE COURT: Well, I think, obviously, you haven't heard all of the evidence, but it sounds like you would have a problem with this, probably even hearing all of the evidence, based on --

VENIREPERSON: I could very easily find the woman guilty, but I still think two years is too harsh.

THE COURT: And you just don't think anything would change after hearing the full evidence of the case?

VENIREPERSON: No.

THE COURT: That you would think that a two year minimum is harsh, no matter what?

VENIREPERSON: Well, I would have to --

THE COURT: Can you give the two year sentence?

VENIREPERSON: A bite does not seem that serious to me.

THE COURT: Can you consider the two years minimum or not?

VENIREPERSON: Not based on what I have heard so far. But, you know.

DEFENSE COUNSEL: May I ask a question?

THE STATE: Well, we would be first.

THE COURT: Go ahead.

THE STATE: [Juror 126]?

VENIREPERSON: Yes, ma'am.

THE STATE: And so you understand we don't, in this type of case, we would not have to prove serious

20

|  |  |
|---|---|
|  | injury; and so I may be misunderstanding you, but it sounds like you may be saying you think two years in prison would be too harsh, not something that you could consider unless you had that serious injury. Is that right? |
| VENIREPERSON: | Basically, yes. |
| THE STATE: | Okay. And you know you have to be able to consider giving the maximum to someone, too. |
| VENIREPERSON: | Okay. I could never do that. I can tell you that right now. |
| THE STATE: | Thank you. |
| THE COURT: | Thank you, ma'am. You can be seated. |
| VENIREPERSON: | Okay. |
| THE COURT: | All right. Number 126 is excused, challenge for cause is granted. All right. |

Although Stastny complains that she was not given an opportunity to rehabilitate juror 126, she did not object when juror 126 was struck or otherwise argue that she was not permitted an opportunity to rehabilitate the juror. Because she failed to object, she has not preserved her claim of error on appeal. *See* TEX. R. APP. P. 33.1(a)(1); *Allridge v. State*, 850 S.W.2d 471, 478–79 (Tex. Crim. App. 1991) (holding appellant's argument that trial court erred by interrupting his attempt to rehabilitate juror after trial court decided to grant State's challenge for cause was not preserved because appellant did not raise this objection at trial); *Ireland v. State*, No. B14-89-00098-CR, 1990 WL 8478, at *2 (Tex. App.—Houston [14th Dist.] Feb. 1,

21

1990, pet. ref'd) (not designated for publication) (error not preserved where appellant did not object to rehabilitation of juror at trial); *see also Wheeler, Tr. of L&P Children's Tr. v. San Miguel Elec. Coop., Inc.*, 610 S.W.3d 60, 71 (Tex. App.—San Antonio 2020, pet. denied) ("The Wheelers complain that they had no chance to rehabilitate jurors 5 and 6, but they did not object when the[] jurors were struck, and they failed to preserve a claim of error.").

We overrule Stastny's fifth issue.

## Conclusion

We affirm the trial court's judgment.

Amparo Guerra
Justice

Panel consists of Justices Goodman, Hightower, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).