

In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

———————————

No. 06-10-00107-CR

———————————

WILLIAM THOMAS LANTRIP, SR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 71st Judicial District Court
Harrison County, Texas
Trial Court No. 09-0205X

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Chief Justice Morriss

OPINION

Although doctors had told seventy-three-year-old William Thomas Lantrip, Sr., not to drink, because drinking was "interactive" with a decades-old brain injury, Lantrip regularly consumed much alcohol.[1]  On Good Friday, 2009, after drinking at least half a case of beer, Lantrip shot his neighbor Kenny Gordon in the back, a wound ultimately proving fatal.[2]  From the resulting conviction and life sentence for murder, Lantrip appeals.  We affirm[3] the trial court's

---

[1]Lantrip testified that, when grocery shopping once a month, he would purchase ten thirty-packs of beer.

[2]The more complete story starts with two young people listening to music in a van, near Lantrip's house.  Randy Lamkin and a friend, Katlan Maxwell, were sitting in Maxwell's van, talking and listening to music, on the afternoon of April 10, 2009.  Lamkin lived with his mother and stepfather—the victim here, Gordon—across the street from Lantrip.  Lamkin and Maxwell were familiar with Lantrip, because Lamkin had done some yard work for Lantrip.  Lantrip, carrying a shotgun and appearing intoxicated, approached the young men and accused them of preparing to burglarize Lantrip's home.  When Lantrip asked Lamkin and Maxwell if they were ready to die, they said they were not.  In response, Lantrip said that he was ready to die.  After a few minutes, Lantrip let the two return to the Lamkin-Gordon house, but not before asking Lamkin to take care of Lantrip's dogs, because Lantrip had a feeling he was going to die that day.  Lantrip also told the two not to call the police.  Lamkin told his parents about the incident; his mother was ready to call law enforcement, but Gordon convinced her not to.

A short time later, Maxwell and Lamkin walked by Lantrip's house on their way to another neighbor's; Lantrip again detained the young men, pointing the shotgun at them.  Lamkin described Lantrip as "real drunk." Gordon came out of his house and told Lantrip to put the gun down.  When Lantrip refused, Gordon said he would call the police and turned to return to his house.  Lantrip then shot Gordon in the back.  When Gordon tried to get up, Lantrip shot him again.  Maxwell ran off, and Lamkin began having an asthma attack, which led to a panic attack. Lantrip allowed Lamkin to go inside.  By this point, Gordon's wife, Connie, had called the sheriff's department.  She ran to Gordon, as he lay in the road bleeding.  She testified Lantrip told her she would die with her husband if she approached Gordon.  A neighbor who happened to be driving by stopped his car between Gordon and Lantrip, and Connie stayed with Gordon as he lay in the road.

Three deputies arrived and Lantrip fired at them.  One deputy shot Lantrip, rendering him unconscious. Gordon was hospitalized, but died two weeks later.  The medical examiner attributed his death to the shotgun blast and ruled the cause of death as homicide.

[3]In a companion case, tried simultaneously with the instant case, Lantrip was found guilty of two counts of attempted capital murder for shooting at Harrison County deputies who arrived on the scene after Gordon had been shot. Lantrip was assessed life sentences on all three charges.  Lantrip has addressed both trial court cases in a single brief, and the issues and facts in the two cases are the same.  In his appeals of all three convictions, Lantrip claims that he successfully proved he was legally insane that night; that the trial court failed to adequately admonish him before he testified; that his motion for new trial should have been granted; and that the trial court erred in refusing to permit him

2

judgment because (1) Lantrip did not prove he was insane; (2) Lantrip was not entitled to admonishment regarding his trial testimony; (3) no newly discovered evidence entitles Lantrip to a new trial; and (4) at trial, Lantrip was not entitled to be dressed, as he chose, in camouflage clothing.

*(1)*    *Lantrip Did Not Prove He Was Insane*

Lantrip claims error in the jury's rejection of his affirmative defense of insanity. He claims the State failed to rebut Lantrip's proof. We cannot say the jury's rejection of his asserted defense was error.

Insanity is an affirmative defense. A defendant asserting the defense must prove "that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." TEX. PENAL CODE ANN. § 8.01(a) (Vernon 2003). In a jury trial, the issue of the defendant's sanity may be presented to the jury[4] only if the issue is supported by competent evidence. TEX. CODE CRIM. PROC. ANN. art. 46C.151(a) (Vernon 2006). Defendants are presumed to be sane and the State carries no burden to prove sanity. *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987); *Sims v. State*, 807 S.W.2d 618, 626 (Tex. App.—Dallas 1991, pet. ref'd). A defendant asserting the affirmative defense of insanity bears the burden of proof. *Meraz v. State*, 785 S.W.2d 146, 150 (Tex. Crim. App. 1990). To succeed

___

to appear at trial in camouflage. By our opinion issued today in the companion appeal, regarding the convictions for attempted capital murder, we affirm that case as well. *See Lantrip v. State*, cause number 06-10-00108-CR.

[4]If the issue is submitted to the jury, the jury shall specify in its verdict whether the defendant is guilty, not guilty, or not guilty by reason of insanity. TEX. CODE CRIM. PROC. ANN. art. 46C.151(b) (Vernon 2006).

3

on such claim, the defendant must prove by a preponderance of the evidence that he or she was insane during the commission of the offense. TEX. PENAL CODE ANN. § 2.04 (Vernon 2003); *Martinez*, 867 S.W.2d 30, 33 (Tex. Crim. App. 1993). Insanity is not established by a defendant's claim to have been unconscious or semiconscious during the offense. *Mendenhall v. State*, 77 S.W.3d 815, 818 (Tex. Crim. App. 2002).

Where a defendant bears the burden of proof on an affirmative defense such as insanity, the standard of review is whether, after considering all the evidence relevant to the issue at hand, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz*, 785 S.W.2d at 155.[5]

Lantrip took the stand in his case-in-chief to assert his defense of insanity. He described how, in his twenties, he had fallen from a moving truck and struck his head on a rock. As a result, he began to suffer blackouts and severe headaches, including migraines. During this period, he was in the Marine Corps. Lantrip said at one point he was confined to a mental ward for six months after pulling a pistol on his commanding officer. Some of Lantrip's military medical

---

[5]Judge Cochran's concurrence in *Brooks v. State*, 323 S.W.3d 893, 924 n.67 (Tex. Crim. App. 2010) (Cochran, J., concurring) suggests that the standard in *Meraz* is still the appropriate review where a defendant had the burden of proof on an affirmative defense. *See also Johnson v. State*, No. 05-09-00133-CR, 2010 Tex. App. LEXIS 10051 (Tex. App.—Dallas Dec. 20, 2010, no pet. h.) (mem. op., not designated for publication) (finding *Meraz* still applies post-*Brooks* to review of affirmative defense). We cite *Johnson* not for any precedential value, but simply note it as we continue to discover the post-*Brooks* landscape. *See Brooks*, 323 S.W.3d at 902, 912 (4-1-4 decision) (finding "no meaningful distinction" between the standards of review in *Jackson v. Virginia*, 443 U.S. 307 (1979), for legal sufficiency of evidence, and that in *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996), for factual sufficiency of evidence).

records were admitted into evidence, including a 1957 document which included the following diagnosis:

> Paranoid schizophrenia, in partial or almost complete remission at the present time but manifested just before admission by very critical and emotionally charged display of feelings toward his own family. Also, manifested by general paranoid tendency toward everyone when he gets to feeling threatened. Treated. Improved. . . . Degree of psychiatric impairment: Minimal to moderate at present.

Lantrip eventually received an honorable discharge. Because he was found to have a 100% disability, his mother was made his guardian. His disability rating was later lowered to 70%.

In his testimony, Lantrip detailed for the jury his history of violent escapades, including shooting, three times, a man who had been picking a fight with him in 1956; the last two shots were after Lantrip had succeeded in getting his attacker off of him. In 1964, he shot the car of a man reportedly caught on a date with Lantrip's wife, and, when tackled by someone to stop him, also shot his wife's sister in the leg, causing her to lose the limb. In 1969, he fired several shots into a house occupied by his ex-wife and her brother, because he believed they were engaged in incest in front of Lantrip's children. In 1986, Lantrip repeatedly stabbed a man he thought was attacking him with a knife, although it later turned out the man had no knife.

As for the incident leading to Gordon's death and Lantrip firing at the deputies, Lantrip told the jury he did not remember any of it. He said he could not remember events from April 9, the day before the shooting, or from April 10. He claimed that his lack of memory of the events was evidence that he was insane at the time. He conceded, based on other witnesses' testimony,

5

he had been drinking April 10, but could not remember how much. He also testified he "limited" his drinking during "work hours" to "no more than half a case a day." However, State's psychologist Thomas Allen testified that Lantrip told him he drank a case of beer a day and that Lantrip knew he was an alcoholic. Lantrip told Allen it was his practice to begin drinking at 4:00 a.m. Several witnesses testified that, on the day of the shooting, Lantrip was very intoxicated, that he was staggering and having great difficulty standing to the point he was using his shotgun as a cane and to help him stand. Two witnesses, Lamkin and neighbor Joseph Hudson, described Lantrip as "mean" when he was drinking. Lantrip admitted that doctors had told him not to drink because alcohol was "interactive" with his brain injury. Allen testified lack of memory of the events surrounding the shooting could have been the result of Lantrip's heavy drinking or of trauma from being shot by the deputy. Allen added that trauma-induced amnesia was more likely in a heavy drinker.

Allen opined that Lantrip was not insane at the time of the shooting and was able to discern right from wrong. Allen cited, as bases for his conclusion that Lantrip could tell right from wrong, that Lantrip told Allen he would pay a neighbor to drive him around so as not to get caught drinking and driving and that Lantrip was reported as threatening to kill Lamkin if he called the police to report Lantrip's earlier threatening behavior. Allen interpreted this conduct as indicating an awareness of the wrongfulness of Lantrip's actions. As for Lantrip's 1957 medical records assessing paranoid schizophrenia, Allen said contemporary diagnostic standards are much

6

more stringent than the standards in place in the 1950s. Allen did not believe the behavior described in Lantrip's 1957 evaluation would qualify as paranoid schizophrenia under current evaluation standards; rather, Lantrip's 1957 behaviors would more likely meet contemporary diagnoses of antisocial personality or antisocial features, anxiety disorder, or "the weakest of a brief psychotic disorder even or a reactive psychosis." There was no indication Lantrip was prescribed medications for the 1957 psychiatric diagnosis or that Lantrip was on any medication at the time of Allen's interview.

Where conflicting evidence on the issue of insanity is presented, determinations regarding the weight and credibility of that evidence should be resolved by the fact-finder, and we defer to those decisions, because the fact-finder has the benefit of observing the witnesses' actions and demeanor. *Dashield v. State*, 110 S.W.3d 111, 116 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The jury was free to reject Lantrip's evidence and find that he had failed to prove his insanity defense. It is true, as Lantrip stresses, that most of the State's witnesses agreed with defense counsel that Lantrip's acts did not make sense, but violence is often senseless. The jury was free to reject Lantrip's assertion that his warnings to Lamkin and Maxwell not to call the police, contrasted with his supposed wish to commit "suicide by cop," were evidence of his insanity. The jury could well have determined that Lantrip was habitually drunk, explaining his supposedly inconsistent positions regarding law enforcement.

7

Lantrip invites us to use the Texas Probate Code's definition of incompetency to evaluate Lantrip's sanity. We decline. Lantrip's theory is that because, in the late 1950s the Veteran's Administration ordered Lantrip's disability checks be paid to his mother as guardian for Lantrip, he is incapacitated under the terms of the Texas Probate Code. Lantrip relies on this reasoning as further evidence of his insanity. Lantrip's reasoning here fails, as incompetency in the Texas Probate Code and insanity in the Texas Penal Code are different concepts.

Lantrip offers no explanation or authority how the Texas Probate Code would apply to a criminal proceeding.[6] He cites us generally to Section 694F of the Texas Probate Code, which concerns a trial court order restoring a ward's capacity. TEX. PROB. CODE ANN. § 694F (Vernon 2003). The Texas Probate Code speaks in terms of capacity or incapacity, where an incapacitated person is one "who, because of a physical or mental condition, is substantially unable to provide food, clothing, or shelter for himself or herself, to care for the individual's own physical health, or to manage the individual's own financial affairs" or one "who must have a guardian appointed to receive funds due the person from any government source." TEX. PROB. CODE ANN. § 3(p)(2), (3) (Vernon Supp. 2010).[7] To the extent a guardian was deemed necessary for Lantrip fifty years

---

[6]*See also Taylor v. State*, 856 S.W.2d 459, 468 (Tex. App.—Houston [1st Dist.] 1993), *aff'd*, 885 S.W.2d 154 (Tex. Crim. App. 1994) (citing *Graham v. State*, 566 S.W.2d 941, 948 (Tex. Crim. App. 1978) (discussing difference between medical and legal insanity)).

[7]Lantrip continues this argument by referencing an earlier version of the Texas Probate Code which included in the category of "persons of unsound mind," *inter alia*, insane persons and those unable to manage their property and financial affairs. TEX. PROB. CODE ANN. § 3(y) (enacted 54th Leg., ch. 55, eff. Jan. 1, 1956, *repealed by* Act of May 27, 1995, 74th Leg., R.S., ch. 1039, § 73, 1995 Tex. Gen. Laws 5145, 5170). Just as we do not find the current

ago, that was evidence which the jury was free to consider or reject, along with the other much more relevant evidence, in determining whether Lantrip proved his affirmative defense of insanity at the time of the instant offense.

In concluding his discussion of this point of error, Lantrip asserts, "[T]he State did not carry its burden of proving sanity beyond a reasonable doubt." As stated above, defendants are presumed sane, and insanity is an affirmative defense to be asserted and proved by a defendant. It is true that, if evidence is admitted of a prior, unvacated adjudication of insanity, the burden shifts to the State to prove, beyond a reasonable doubt, the defendant's sanity at the time of the offense. *Manning v. State*, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987). Although Lantrip relied on evidence of his mental health diagnoses from the 1950s to prove his insanity defense, there was no evidence of a prior adjudication of insanity.[8] Thus, the burden remained Lantrip's. After reviewing all the evidence, we cannot say the jury's rejection of Lantrip's claim of insanity is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Meraz*, 785 S.W.2d at 155.

*(2)    Lantrip Was Not Entitled to Admonishment Regarding His Trial Testimony*

---

Probate Code controlling in Lantrip's trial conducted under the Texas Penal Code and Texas Code of Criminal Procedure, we do not find the fifty-year-old version of the Texas Probate Code helpful.

[8]Lantrip offers no authority to support an argument that the finding of disability and that he needed a guardian fifty years ago is the equivialent of an adjudication of insanity as contemplated by Texas caselaw. *See Manning*, 730 S.W.2d at 748.

9

Lantrip was the only defense witness at the guilt/innocence stage of trial. As summarized above, he testified about his head injury, his violent past, his drinking habits, and claimed that he blacked out on the day of the shooting. Before Lantrip testified, outside the presence of the jury, the trial court told Lantrip he possessed a constitutional right to remain silent, and no one, including the court, could force him to testify. The court told Lantrip that, if he decided to testify, the State would be able to "ask any questions that they want to ask" and Lantrip would "have to respond." Lantrip told the trial court he understood this and agreed he made the choice to testify freely and voluntarily and was not being forced or coerced. After the trial court questioned Lantrip, his defense counsel confirmed that it was Lantrip's desire to testify in order to assert his defense of insanity and tell his version of the events.

On appeal, Lantrip claims the trial court's admonishments were insufficient and thus caused reversible error. We disagree.

A trial court has no duty to advise a testifying defendant, represented by counsel, of his or her right not to testify. *Newell v. State*, 461 S.W.2d 403, 404 (Tex. Crim. App. 1970). While it is true *Newell* involved a plea of guilty, we have found no authority or reason why the same does not apply where a defendant pleads not guilty. When a defendant, represented by counsel, takes the stand to testify in his or her own defense, we presume that the act is done voluntarily and with full knowledge of the defendant's rights. *Mullane v. State*, 475 S.W.2d 924, 926 (Tex. Crim. App. 1971).

10

Lantrip complains on appeal he was not told that evidence or testimony elicited from him could be used to incriminate him.[9] He offers, though, no authority establishing any duty by the trial court to admonish him at all. *See Newell*, 461 S.W.2d at 404. Lantrip clearly told the trial court he understood that the State's attorney would be able to cross-examine him. The record supports a finding that Lantrip's waiver of his right not to testify was made knowingly and voluntarily. We overrule this point of error.

*(3)     No Newly Discovered Evidence Entitles Lantrip to a New Trial*

Lantrip also claims the trial court erred in not granting his motion for a new trial. A new trial shall be granted to an accused where material evidence favorable to the accused has been discovered since trial. TEX. CODE CRIM. PROC. ANN. art. 40.001 (Vernon 2006). Not only does the decision to grant or deny such a motion fall within the sound discretion of the trial court, subject to reversal only on a finding of an abuse of that discretion, but these motions are generally disfavored by the courts and viewed with great caution. *Lewis v. State*, 126 S.W.3d 572, 579 (Tex. App.—Texarkana 2004, pet. ref'd). A trial court does not abuse its discretion in denying a motion for new trial unless the record demonstrates that (1) the newly discovered evidence was unknown at the time of the trial; (2) the failure to discover the new evidence was not due to a lack of diligence; (3) the new evidence is admissible and not merely cumulative, corroborative,

---

[9]Lantrip complains all the evidence of extraneous offenses would be considered by the jury in its consideration of his guilt for the instant offenses. Lantrip himself described in great detail his several prior violent offenses committed over three decades in his testimony under direct examination. Obviously, this was part of the risk of taking the stand, but the fact that the evidence was presented does not create a duty on the part of the trial court where none exists.

11

collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial.  *Id*.[10]  None of these requirements are present here.

At the hearing on the motion for new trial, Lantrip offered an excerpt from the hospital records where he was admitted after being shot by Deputy Johnson.  Lantrip directed the trial court to the sections noting, "Neuro:  Positive for altered mental status" and "Neuro: Orientation:  Not oriented to person, place, time.  Mentation:  confused."  Lantrip admits that he is not relying on this evidence as "newly discovered," but argues that it could have been used to impeach or contradict the State's trial expert, psychologist Dr. Tom Allen.  This may be, but Lantrip must still establish the elements listed above to be entitled to a new trial.

There is nothing to suggest Lantrip's own medical records were not available to him before trial.  We cannot say the initial diagnostic notes are material to Lantrip's defense of insanity. The doctor's written comments that Lantrip had an "altered mental status," was "[n]ot oriented to person, place, [or] time" and was "confused" were corroborative and cumulative to Lantrip's trial testimony he blacked out and did not recall the events around the shootings.   As he suggests in his appellate brief, he could have used these comments to undermine or impeach the State's

---

[10]The State urges us to overrule Lantrip's point of error as inadequately briefed.   In his brief, Lantrip does not cite the above law regarding motions for new trial.   Nor does he cite Article 40.001 of the Texas Code of Criminal Procedure stating a new trial shall be granted where material evidence, favorable to a defendant, has been discovered since trial; nor does Lantrip cite Rule 21.3 of the Texas Rules of Appellate Procedure.   TEX. CODE CRIM. PROC. ANN. art. 40.001; TEX. R. APP. P. 21.3.   An appellant's brief "must contain . . . appropriate citations . . . to the record."   TEX. R. APP. P. 38.1(h).   Nonetheless, we will, in the interest of justice, review whether Lantrip showed himself entitled to a new trial.

12

psychologist. Not only does this evidence not qualify as newly discovered, but it is "merely cumulative, corroborative, collateral, or impeaching." *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003).[11] It also reflects his condition after his encounter with deputies, during which he was, himself, shot and rendered unconscious. We overrule Lantrip's third point of error.

*(4)    At Trial, Lantrip Was Not Entitled to Be Dressed, as He Chose, in Camouflage Clothing*

Lantrip argues that the trial court erred in allowing him to wear jail-issued, orange clothes during his jury trial. Before trial, Lantrip advised the trial court, "I want camouflage in court, Judge. I wore prison white for 30 years, and I've decided it's camouflage from here on out." The trial court said that wearing camouflage in the courtroom was not acceptable and offered to provide Lantrip some of the judge's own clothes. Lantrip refused.[12] Throughout trial, several witnesses identified Lantrip with reference to his orange clothes.

Being forced to appear at a jury trial in jail clothes may impinge on a defendant's presumption of innocence. If he or she does not wish to appear in such attire, it is incumbent on the defendant to make a timely objection to the trial court. *See Randle v. State*, 826 S.W.2d 943,

---

[11]Nor can it be said these comments from the emergency room doctor render the "verdict [] contrary to the law and the evidence." TEX. R. APP. P. 21.3(h). At most, the proffered comments are cumulative of the trial testimony or would be used to impeach Dr. Allen's expert testimony.

[12]After this brief hearing, during which the trial court threatened Lantrip with contempt of court and then found him in contempt of the court's order, the court ordered Lantrip returned to the holding cell. No reference was made to the contempt holding or to Lantrip's appearing in the orange jail clothes.

945–46 (Tex. Crim. App. 1992).[13]   Lantrip made no such objection.   In fact, it was his clearly expressed preference to wear the jail-issued outfit over civilian clothes.   Lantrip was free to make this decision.   *See Estelle v. Williams*, 425 U.S. 501, 508 (1975) ("it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury").

Lantrip argues the trial court should have granted his preference, to be tried in camouflage. He offers no support for this claim, other than arguing that camouflage is Lantrip's preferred attire. The trial court has discretion in the administration of the courtroom in order to maintain a proper level of decorum and dignity.   *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *see also Gonzales v. State*, 2 S.W.3d 600, 607 (Tex. App.—Texarkana 1999, pet. ref'd) ("trial judge has the inherent power to control the orderly proceedings in the courtroom").   We cannot say the trial court abused its discretion in not allowing Lantrip to wear camouflage clothing in the courtroom. *See Johnson v. State*, 838 S.W.2d 906, 909 (Tex. App.—Corpus Christi 1992, pet. ref'd) ("To hold otherwise would require us to entertain the notion that the Due Process Clause or Art. 2.03(b) provide a defendant the right to appear before the jury in clothes of his choice, and perhaps of a particular style.").   We overrule this point of error.

We affirm the judgment of the trial court.

---

[13]*See also Wickware v. State*, 486 S.W.2d 801, 804–05 (Tex. Crim. App. 1972) (affirming trial court's judgment when appellant failed to object to being tried in jail clothes and noting that he could not "remain silent and then claim error for the first time on appeal"); *Barber v. State*, 477 S.W.2d 868, 870 (Tex. Crim. App. 1972) (affirming trial court's judgment when record failed to reflect that appellant was in jail uniform during voir dire and no objection made to being in jail clothes).

Josh R. Morriss, III
Chief Justice

Date Submitted:     January 12, 2011
Date Decided:       February 4, 2011

Publish