

# NUMBER 13-23-00384-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

ALEX ROJAS,                                                                      Appellant,

v.

THE STATE OF TEXAS,                                                              Appellee.

## ON APPEAL FROM THE 23RD DISTRICT COURT
## OF MATAGORDA COUNTY, TEXAS

# MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Silva and West
Memorandum Opinion by Justice Silva**

Appellant Alex Rojas appeals his capital murder conviction. *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(8). By three issues, Rojas argues that (1) the trial court erred in allowing a juror to see him in shackles and jail clothing during the guilt-innocence phase of trial; (2) the trial court erred in admitting the "extremely graphic" autopsy photos of the

victim; and (3) he received ineffective assistance of counsel. We affirm.

## I.  BACKGROUND

On December 15, 2020, Rojas was babysitting his girlfriend I.G.'s thirteen-month-old child, J.C.[1] I.G. left for work that morning around 8:00 or 8:30 a.m. Around 11:36 a.m., I.G. received a Facebook message from Rojas stating, "I [gave J.C.] a bath earlier and I had him on the bed so [I] went to make him a bottle and he fell off the bed and hit his head[. H]e was screaming bad but once I gave him the bottle he passed out, but he's breathing funny babe." Shortly after, I.G. returned home and observed that J.C. was unconscious, would not wake up, and "his body was limp." I.G. then called 911. J.C. was then transported to Palacios Medical Center (PMC).

At PMC, J.C. was initially treated by Doctor John Pulvino. He described J.C.'s condition as "one of the most significant traumas I have seen from a head trauma in a pediatric patient." Pulvino compared J.C.'s injuries to getting kicked by a horse or a cow. He further noted that taking care of J.C. was "probably the worst day I have had in medicine." After the initial visit at PMC, a decision was made to transfer J.C. to Texas Children's Hospital (TCH) in Houston, which was better equipped for his level of pediatric trauma. The transfer was made in El Campo, and J.C. was picked up by a TCH ambulance. On the way to TCH, Rojas messaged I.G. stating, "I'm sorry, I should've put him in [t]he play p[e]n." At TCH, J.C. was treated by Doctor Kawbena Sarpong. He

---

[1] To protect the identity of the child victim of this case, we refer to him and his mother by initials. *See* TEX. CONST., art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); TEX. R. APP. P. 9.10(a)(3) (protecting the privacy of "any person who was a minor at the time the offense was committed" by designating the minors' names, dates of birth, and home address as "[s]ensitive data" requiring redaction); *see also Perez v. State*, 689 S.W.3d 369, 374 n.1 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.) ("Out of an abundance of caution, we will also use initials to identify [his] immediate family members.").

described J.C.'s injuries after being admitted to TCH:

> I [would] like to probably start from the head down or outside of the body and I will go down. Outside the body on the skin[, J.C.] had a bruise on the right ear and bruises on the forehead and had bruises on the chest. That was outside what you could see. Then we scanned the head. On the head[,] he had a fracture. That means a part of the left side of the skull was broken. And then you go inside the brain. The brain was swollen . . . and there was also blood inside the brain as well. And then when you come down to the neck[,] what happens is that your head . . . is connected to your spine.
>
> . . . .
>
> So[,] the head is connected to your spine in two places. On the right side[,] it had separated. That means the right side of the head was not connected to the right part of the spine. So[,] those were the injuries found. And the eyes[,] there was bleeding inside the eyes as well.

After various medical procedures and surgical intervention, J.C. was ultimately placed on life support. When he was not showing signs of improvement, I.G. made the decision to take J.C. off of life support, and he passed away shortly thereafter on December 18, 2020.

## A.  Procedural History

On May 24, 2021, Rojas was indicted for capital murder of a person under ten years of age. *See id.* The indictment specifically alleged that on December 18, 2020, Rojas intentionally and knowingly caused the death of J.C. by shaking and striking him. A jury was empaneled on August 7, 2023, and trial commenced that same day. In a trial spanning over three days, thirteen witnesses testified and over one hundred eighty exhibits were admitted. We summarize the relevant testimony and evidence below.

## B.  Law Enforcement Testimony

Retired Palacios Police Department (PPD) Lieutenant Vaughn Dierlam testified that he obtained a voluntary recorded statement from Rojas concerning J.C.'s case. He

3

further testified that prior to this recorded statement, Rojas provided a written statement. Lieutenant Dierlam stated that Rojas's written statement read as follows:

> I have been dating [I.G.] for about seven months. I babysit her one-year-old for the about seven months [sic] when she goes to work. I went over to [I.G.]'s apartment on Monday night and spent the night. [I.G.] went to work at 8:30 a.m. J[.C.] was asleep—I'm sorry, in the playpen. [I.G.] texted me at 10:30. He spilled milk. I gave him a bath and dressed him. I watched J[.C.] I went to the kitchen to fill [J.C.'s] bottle and heard J[.C.] screaming. I ran to the bedroom and saw J[.C.] on the floor beside the bed. I picked him and held him to my shoulder and he stopped crying. I gave him his bottle and laid him down in the playpen and he went to sleep. About 10 minutes late[r] I heard he was breathing funny. I called [I.G.]. She came in about 10 minutes. [I.G.] couldn't wake up J[.C.] and [I.G.] called the ambulance. The [a]mbulance took J[.C.] to the hospital. J[.C.] was transported to [the] El Campo Hospital and the Houston Hospital. [I.G.] road in the ambulance. I drove to Houston. I waited and came home about 9:30 a.m.

## C.    Medical Testimony and Photographs

At issue in this appeal are State's Exhibits 130 through 175 and 178 through 183. These exhibits are color photographs of J.C. depicting his body, bones, and organs at various stages of the medical and autopsy procedures, both clothed and unclothed. We will proceed to describe each photograph based on the relevant medical testimony.

### 1.    State's Exhibits 130 through 133

Registered Nurse Chelsea Ecby testified that she was working at the PMC emergency room on December 15, 2020, when she learned that a "[child] trauma" would be arriving. During her testimony, the State sought admission of State's Exhibits 130 through 133, which depicted J.C. as he appeared in the emergency room on December 15, 2020. The trial court admitted the exhibits without objection from Rojas.[2] Ecby described State's Exhibit 130 as showing "bruising to [J.C.'s] right side of the facial area.

---

[2] These photographs appeared to be affixed to a TCH medical report.

4

It's just gross bruising on the partial area around the eyes." She next described State's Exhibit 131 as "[m]ore bruising [and] possibly abrasions to the chest and arm areas." Ecby stated that State's Exhibit 133 depicted "the left side of [J.C.'s] face with more bruising and [a] possible abrasion."

Doctor Sarpong confirmed that State's Exhibit 130 through 133 were photographs taken when J.C. was admitted to TCH. He further confirmed that State's Exhibit 130 showed bruising on J.C.'s face. Regarding State's Exhibit 131, Sarpong testified that "[w]hen you carefully look at the ear[,] there is also bruises." Next, he described State's Exhibit 132 that shows a photograph of J.C.'s chest. He stated that there had to have been direct trauma to his trunk because he had bruising there. Sarpong also stated that there were bruises to J.C.'s left side in State's Exhibit 133.

### 2. State's Exhibits 134 through 166

Doctor Hannah Jarvis testified that she is a forensic pathologist who works as the Assistant Deputy Chief Medical Examiner for Harris County. Jarvis further testified that she has conducted over two thousand autopsy examinations. An autopsy was performed on J.C. on December 19, 2020, and stated that the cause of death was "blunt trauma of the head and neck" and that the manner of death was homicide. She was requested to review the autopsy in J.C.'s case. Jarvis confirmed that J.C.'s autopsy findings were the same as hers. During her testimony, the State sought to admit color photographs of J.C., which were admitted by the trial court without objection from Rojas. These photographs depicted J.C. postmortem, both clothed and unclothed. State's Exhibit 134 through 139 depicted various angles of J.C. in a body bag. State's Exhibits 140 through 144 are photographs of J.C. with medical intervention from hospital staff, such as an IV, tape, and

5

a neck brace. Regarding State's Exhibit 145, Jarvis explained the following:

> So this is a photograph, as I mentioned after the clothing is removed and the medical devices and the body has been cleaned and washed and dried, and this is one of the initial photographs that are taken at that point and so here—so we can see that the child had come from the hospital. There are staples on the side of the head following a surgical procedure, an operation and some of the hair has been shaved and here across the forehead we see bruising.

She next described State's Exhibit 146 as "a better look at that surgical wound" and "blood under the surface of the skin here from bruising or contusions or blood following the operation." State's Exhibits 147 and 148 depicted similar observations. Jarvis stated that J.C.'s brain matter was visible in State's Exhibit 149. State's Exhibit 150 shows a top angle of the surgical wound, with a pair of blue scissors. Jarvis confirmed that State's Exhibit 151 showed bruising on J.C.'s left ear which could also be related to J.C.'s surgery. There was also bruising on J.C.'s right ear in State's Exhibit 152. In State's Exhibits 153 and 154, J.C.'s scalp is shaved and they show different angles of discoloration and bleeding in the skin tissues. State's Exhibit 155 through 158 shows additional bruising on J.C.'s body at varying angles. State's Exhibit 159 through 161 shows J.C.'s eyelids. Jarvis explained that the little dots seen in these photographs "are petechial hemorrhages" which "are tiny little ruptures of capillaries." She explained that State's Exhibit 162 depicted J.C.'s "lower lip that has been pulled down" and that "you can see red/purple discoloration which[,] again[,] is bruising underneath the surface of the tissue." Further, State's Exhibit 163 through 167 showed different angles of the photographs discussed by Jarvis.

Jarvis further explained that the bulk of J.C.'s injuries were to his head. The following exchange then occurred:

6

| | |
|---|---|
| [The State]: | After your external exam, did an internal exam start? |
| [Jarvis]: | Yes. So[,] the most significant findings were confined to the head as well as the neck in this case. And so[,] in addition to the bruising on the outside of the head, there was bleeding inside the tissues of the scalp. There was a fracture or break in the skull on the left side of the skull. There was bleeding on the surface of the brain called subdural hemorrhage. There was bleeding on the surface of the brain called subarachanoid hemorrhage. The brain was swollen and softened and . . . was herniating; meaning, because of the bleeding around the brain and the swelling of the brain, the brain was being pushed into areas where it doesn't normally go. |
| [The State]: | What about the findings specifically about the brain, what did they indicate to you? What causes this? |
| [Jarvis]: | This is caused by blunt force trauma; meaning, there was some type of impact that occurred against the head to cause a broken skull and bleeding on and around the brain. |
| . . . . | |
| [The State]: | Now, . . . at the time of autopsy[,] your team was aware [of a] child reported to become unresponsive after rolling off a bed consisting of a mattress and a box spring; is that what you understand? Because earlier you said this doesn't happen in [a] vacuum. You said what was reported to you law enforcement as well as medical professionals [sic]? |
| [Jarvis]: | Yes. |
| [The State]: | Are your findings consistent with that? |
| [Jarvis]: | No, they are not. |

7

| [The State]: | What are your findings consistent with? |
|---|---|
| [Jarvis]: | The types of findings where a skull is broken and this level of damage to the brain and neck is caused by a much more substantial force, a much greater impact. |
| [The State]: | Was there evidence to support the fact that the child had been violently shaken and struck against something? |
| [Jarvis]: | Yes, it would be consistent with that scenario. |

### 3. State's Exhibits 168 through 175

Doctor Julie Fleischman testified that she is a forensic anthropologist with the Harris County Institute of Forensic Sciences (HCIFS). During Fleischman's testimony, the State sought admission of certain photographs relevant to J.C.'s autopsy procedure. However, Rojas objected stating, "these photographs are inflammatory and prejudicial," and the trial court overruled his objection. Fleischman described State's Exhibit 168 as a portion of J.C.'s skull that was removed during a medical procedure. She explained that "it's two pieces that collectively make up the left side of [J.C.'s] head." State's Exhibit 169 is a photograph of J.C.'s cranium. Fleischman stated that "[t]he cranium is simply the top round part of the skull." This photograph depicts J.C.'s skull with part of his facial skin intact. Next, Fleischman described State's Exhibit 170. She explained that this photograph was "looking down at [the] top of the cranium" including "a surgical cut" and "burr holes." State's Exhibit 171 depicted the left side of J.C.'s skull. Fleischman explained that "this is a fracture or broken bone." State's Exhibit 172 is another view of the left side of J.C.'s skull depicting "the fracture." In State's Exhibit 173, Fleischman explained that the jury was seeing "the back left part of [J.C.'s] head." She further explained that this

8

photograph showed "the autopsy cut," "part of the surgical cut and the burr hole," and the "fracture . . . on the occipital bone which is right at the back of [J.C.'s] head." State's Exhibit 174 shows a closer view of the fracture depicted in the previous exhibit. Fleischman finally explained that State's Exhibit 175 shows "the inside left of the skull[. T]hose are the two pieces that were submitted from the hospital, glued back together at the location of that fracture." She testified that the fracture went "all the way through the bone and it was in two pieces. We put it back together for a better exam." On re-direct, Fleischman confirmed that the fracture in J.C.'s skull was "consistent with a minimum of one blunt force impact to the posterior left cranium[,] which is the back left side of the head."

### 4. State's Exhibits 178 through 183

Doctor Kent Heck testified that he is a medical doctor who works for HCIFS and explained that HCIFS conducts autopsies. During his testimony, the State requested admission of State's Exhibits 178 through 183. Rojas again objected stating, these photographs "are inflammatory[ and] prejudicial" and "are eliciting more of an emotional response," but the trial court overruled his objection. Heck confirmed that these photographs were helpful in documenting what was seen during the examination of J.C. State's Exhibit 178 depicted "the front of [J.C.'s] eye." In relation to this exhibit, Heck stated that "this is not normal" and that "it's hemorrhage from several days prior." He explained that hemorrhage means that "[t]he retina is filled with capillaries . . . and under certain circumstances[,] they will bleed and you will get hemorrhages throughout the curtain of tissue or the retina." This confirmed the presence of bleeding inside J.C.'s retina. State's Exhibit 179 depicted J.C.'s brain with no skull. Heck explained that there

9

was visible "blood that collected in the area just beneath where the fracture was on the left side of the skull." State's Exhibit 180 was another photograph of J.C.'s brain, but upside down this time. He explained that "[t]he brain was severely swollen" and when that happens "it has nowhere to go so it squirts down and one of the holes is . . . leading to the spinal column." State's Exhibit 181 depicted slices of J.C.'s brain. Heck explained that certain areas that appear darker are "from the trauma of the impact of the skull that cause[d] the underlying bruising." He also confirmed that the visible brain bruising is consistent with the skull being forcibly struck. State's Exhibit 182 was a photograph of J.C.'s entire spinal cord. Heck stated, "Normally it should be a tan or pink color[, but] because it's a dark gray or almost blue color means something is wrong." Finally, he described State's Exhibit 183 as the "sheath[] that covers the spinal column or spinal cord and there is the spinal cord in the middle." He further explained that "[w]e have determined the reason for the discoloration is the blood and you can now see it."

## D. Jail Clothing and Shackles

During the last day of trial, a juror purportedly observed Rojas in jail clothing and shackles. The following exchange occurred:

| | |
|---|---|
| THE COURT: | One of the jurors has seen [Rojas] in jail clothes and so, we are talking about what to do. Do we want to bring that juror out? |
| . . . . | |
| [The State]: | Judge[,] it's my understanding having spoken with the transport officer as he was moving [Rojas] to and from the courthouse in the basement to the transport vehicle, that [Rojas] was handcuffed and shackled yesterday. [Rojas] told [the transport officer] that the juror had seen him and pointed it out and this |

10

| | |
|---|---|
| | morning as . . . the transport officer was bringing [Rojas], that same vehicle was already here. It was about 8:00 o'clock this morning that juror arrived early this morning and the [transport officer] believes that . . . the juror may have seen [Rojas]. So[,] I think . . . first is to determine whether or not the juror has seen [Rojas] and if so[,] if he has seen him in handcuffs [or] in shackles such that it effects the presumption of innocence. |
| [Rojas's counsel]: | And inquire as to if he has discussed it with anyone else on the jury. |
| THE COURT: | The first question would be maybe have you seen [Rojas] outside the courtroom. |
| [The State]: | Correct. |
| THE COURT: | Do you know which [juror] it is? |
| [The State]: | I believe he was number 28 on the strike list. |
| . . . . | |
| THE COURT: | How do we want to do this[?] It might be safer in chambers. So[,] let's head back there and . . . bring [Juror 28] back there. |
| [The State]: | Hey, [Juror 28], there has been a suggestion that you may have seen [Rojas] in the basement[,] is that true? |
| [Juror 28]: | Yes, I did. |
| [The State]: | Did you notice how he was dressed? |
| [Juror 28]: | No, sir, I didn't pay much attention. |
| [The State]: | Okay. So[,] there is nothing about seeing him, about being down there that effects your thoughts in this case?[3] |

---

[3] The reporter's record does not contain a response from Juror 28 regarding the State's question.

THE COURT:  That's it. We will get started in a minute. Thank you.

State, [you] may call your next witness.

Following this exchange, Rojas's counsel did not object concerning Juror 28, and the State proceeded with the presentation of its case-in-chief.

**E.  Verdict and Sentence**

Rojas was found guilty of capital murder and sentenced to imprisonment for life without the possibility of parole. This appeal followed.

## II.  JAIL CLOTHING

By his first issue, Rojas contends "[i]t was constitutional error for the trial court to allow a juror to see [Rojas] in shackles and jail clothing in the midst of the guilt-innocence phase of trial." The State responds in part that Rojas failed to preserve this issue for review, and therefore, it has been waived. *See* TEX. R. APP. P. 33.1(a). We agree.

"[P]reservation of error is a systemic requirement that must be reviewed by the courts of appeals." *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021). As a prerequisite to presenting a complaint for appellate review, "Texas Rule of Appellate Procedure 33.1 requires a timely, specific objection and a ruling by the trial court." *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021) (citing TEX. R. APP. P. 33.1(a)). The appealing party carries "the burden to bring forth a record showing that error was preserved." *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). There are a few exceptions to which Rule 33.1(a) does not apply: (1) "absolute rights," which are "widely considered so fundamental to the proper functioning of our adjudicatory process . . . that they cannot be forfeited . . . by inaction alone"; and (2) "rights that are

12

'not forfeitable'—they cannot be surrendered by mere inaction, but are 'waivable' if the waiver is affirmatively, plainly, freely, and intelligently made." *Garza v. State*, 435 S.W.3d 258, 260 (Tex. Crim. App. 2014) (quoting *Marin v. State*, 851 S.W.2d 275, 279–80 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997)). "Barring these two narrow exceptions, all errors—even constitutional errors—may be forfeited on appeal if an appellant failed to object at trial." *Id.* at 260–61.

Complaints regarding a juror seeing a defendant in jail clothing implicate neither a waivable-only right nor an absolute systemic requirement and fall under the purview of Rule 33.1(a). *See Estelle v. Williams*, 425 U.S. 501, 512 (1976) (holding failure to object to being tried in jail clothing in trial court negated the presence of compulsion necessary to establish a constitutional violation); *Randle v. State*, 826 S.W.2d 943, 945 (Tex. Crim. App. 1992) (concluding that appellant preserved error by objecting in the trial court as to the complaint that he was wearing jail clothes during trial); *Maghe v. State*, 496 S.W.2d 71, 72 (Tex. Crim. App. 1973) (holding defendant cannot complain on appeal "that he was tried in jail clothes or that he was in jail clothes while the jury was impaneled" absent an objection at trial); *Lantrip v. State*, 336 S.W.3d 343, 351 (Tex. App.—Texarkana 2011, no pet.) (explaining if a defendant does not wish to appear in jail clothing, "it is incumbent on [him] to make a timely objection to the trial court).

The record indicates that once the issue concerning a juror seeing Rojas being transported in shackles and jail clothing was brought before the trial court, a brief hearing was held. During such hearing, Rojas made no objection to the juror's observations, and the State proceeded with its case-in-chief. Rojas failed to preserve error in the trial court

13

as to his first issue by failing to object and has thus waived this complaint for appellate review. *See Estelle*, 425 U.S. at 512; *Randle*, 826 S.W.2d at 945; *Maghe*, 496 S.W.2d at 72; *Lantrip*, 336 S.W.3d at 351. We overrule Rojas's first issue.

### III. AUTOPSY PHOTOGRAPHS

We next turn to Rojas's objections to the autopsy photographs. Rojas contends that the trial court erred when it admitted the "extremely graphic" autopsy photographs of J.C. "which were more prejudicial than probative." He specifically challenges State's Exhibits 167 through 175 and 178 through 183.

Rojas also raises additional arguments in his brief that the autopsy photographs at issue "did not add additional information to the testimony" and evidence shown to the jury; were "duplicative of evidence that had already been admitted . . . and added nothing to that evidence other than shock and emotionality"; and were unnecessary because the State could have called additional witnesses if needed. However, in relation to J.C.'s autopsy photographs, Rojas's counsel objected to two separate instances where the State sought to introduce such photographs stating, "these photographs are inflammatory and prejudicial" and "are eliciting more of an emotional response." Rojas's counsel did not object to the admission of any other photographs. Therefore, we construe Rojas's trial objections as complaints regarding unfair prejudice under Rule 403. *See* TEX. R. EVID. 403.

"To preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired." *Simmons v. State*, 288 S.W.3d 72, 77 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (citing TEX. R. APP. P. 33.1(a)(1)). "A defendant's appellate contention must comport

14

with the specific objection made at trial." *Id.* (citing *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002)). "An objection stating one legal theory may not be used to support a different legal theory on appeal." *Id.* (citing *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995)). "A reviewing court will not consider errors, even of constitutional magnitude, not called to the trial court's attention." *Id.* (citing *Broxton*, 909 S.W.2d at 918).

As discussed above, Rojas's Rule 403 objections were based on "unfair prejudice" and not on any of the other basis for exclusion under that rule. *See* TEX. R. EVID. 403. Because Rojas's additional arguments on appeal do not comport with his arguments made at trial, he has failed to preserve these issues for our review. *See* TEX. R. APP. P. 33.1(a)(1). Accordingly, we will proceed to evaluate Rojas's contentions concerning unfair prejudice under Rule 403. *See* TEX. R. EVID. 403.

## A. Standard of Review and Applicable Law

We review a trial court's evidentiary rulings for abuse of discretion. *Inthalangsy v. State*, 634 S.W.3d 749, 754 (Tex. Crim. App. 2021). If a trial court abuses its discretion in admitting evidence, we will disregard the error unless it affected the defendant's "substantial rights." *Dawkins v. State*, 557 S.W.3d 592, 604 (Tex. App.—El Paso 2016, no pet.) (quoting TEX. R. APP. P. 44.2(b)). We will not interfere with a trial court's ruling on the admission or exclusion of evidence unless it falls outside the zone of reasonable disagreement. *Torres v. State*, 71 S.W.3d 758, 760 (Tex. Crim. App. 2002).

"The admissibility of a photograph is within the sound discretion of the trial judge." *Rodriguez v. State*, 398 S.W.3d 246, 253 (Tex. App.—Corpus Christi–Edinburg 2009, no pet.) (quoting *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006)). In general, autopsy photographs are admissible if they do not depict "mutilation of the victim caused

15

by the autopsy itself." *Pugh v. State*, 639 S.W.3d 72, 87 (Tex. Crim. App. 2022). A trial court does not abuse its discretion by admitting autopsy photographs that "aid in interpreting and understanding the testimony adduced at trial." *Harris v. State*, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983). The admission of such photographs may aid in explaining "the manner of death, the cause of death, the time of death, and the number of wounds sustained" by the victim. *Long v. State*, 823 S.W.2d 259, 274 (Tex. Crim. App. 1991). "Photographs that aid a jury in understanding a victim's injuries are relevant and thus probative." *Drew v. State*, 76 S.W.3d 436, 452 (Tex. App.–Houston [14th Dist.] 2002, pet. ref'd). If a jury could not fully see the extent of a victim's external injuries, photographs depicting internal injuries are particularly relevant, even if the photographs show skin excised by the autopsy or surgical procedure. *Hayes v. State*, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002).

Under Rule 403, the trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see also id*. R. 401 (providing that evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence). "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Hill v. State*, 392 S.W.3d 850, 856 (Tex. App.—Amarillo 2013, pet. ref'd) (citing *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007)). "A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice." *Gallo*, 239 S.W.3d at 762. "These factors

16

include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed." *Id.* An additional factor is whether "the ultimate issue was not seriously contested by the opponent." *Peterson v. State*, 137 S.W.3d 739, 746 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (quoting *Salazar v. State*, 38 S.W.3d 141, 152 (Tex. Crim. App. 2001)). "The availability of other means of proof and the circumstances unique to each individual case must also be considered." *Gallo*, 239 S.W.3d at 762.

## B.      Analysis

Here, the State was required to prove that Rojas committed capital murder of J.C. by shaking and striking him. *See* TEX. PENAL CODE §§ 19.02(b)(1), 19.03(a)(8). Prior to admission of the complained-of photographs, Rojas's Facebook message to I.G. stating that J.C. "fell off the bed and hit his head" as well as his statement to law enforcement that he "went to the kitchen to fill [J.C.'s] bottle and heard J[.C.] screaming. I ran to the bedroom and saw J[.C.] on the floor beside the bed" were admitted into evidence. The Facebook message and statement to law enforcement effectively contested the ultimate issue in the case—whether Rojas caused the death of J.C. *See id.*; *Peterson*, 137 S.W.3d at 746. Under these circumstances, we conclude the complained-of photographs were highly probative because they showed the true nature of J.C.'s injuries, which aided the jury in assessing the cause of said injuries and the credibility of Rojas's statements. *See Williams v. State*, 301 S.W.3d 675, 692 (Tex. Crim. App. 2009) (explaining that photographs were probative because they depicted the victim's injuries); *Gallo*, 239 S.W.3d at 763 (concluding "photographs were highly probative to show the full extent of

17

the injuries appellant inflicted on the victim"). Having concluded the probative nature of the photographs, we now assess whether the trial court erred in admitting the photographs over Rojas's objections. In doing so, we turn to the *Gallo* factors discussed above. *See Gallo*, 239 S.W.3d at 762.

We first note that the photographs at issue were in color and were accompanied by the testimony of the State's medical witnesses. The first photograph depicts J.C. postmortem with bruising and a visible surgical wound on his head. Several of the photographs depict the same parts of J.C.'s body, bones, and organs after medical intervention and an autopsy; however, they did so from various angles and distances. In addition, a majority of the photographs depicted J.C.'s injuries—all which tended to prove J.C. was "physically abused and that [his] death from head trauma could not have been accidental." *See Dawkins*, 557 S.W.3d at 606. Moreover, the photographs are highly probative in light of the testimonies of Jarvis, Fleischman, and Heck. The State offered the testimony of these medical practitioners and established their qualifications and credibility. While most of the photographs depicted bloody portions of J.C.'s skull and organs, these photographs were explained by the medical witnesses. *See Rayford v. State*, 125 S.W.3d 521, 530 (Tex. Crim. App. 2003) ("[A]lthough some of the photos reflected alterations of the victim's body or organs due to the autopsy procedures, these were fully explained to the jury as necessary to a thorough examination of the injuries."). The photographs at issue confirmed that an autopsy was performed and permitted the jury to assess the extent of J.C.'s injuries as well as judge the credibility of the medical testimony for themselves. *See Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999) ("Visual evidence accompanying testimony is most persuasive and often gives

the fact finder a point of comparison against which to test the credibility of a witness and the validity of his conclusions."). In light of credibility considerations, the additional probative value of these photographs weighs in favor of admissibility. *See* TEX. R. EVID. 403.

The photographs also supported the medical examiner's finding that J.C.'s cause of death was from "blunt trauma of the head and neck." *See Long*, 823 S.W.2d at 274. While certain photographs offered by the State depicted aspects of J.C.'s autopsy that would ordinarily be considered gruesome to some, "the emotional impact of seeing a child's corpse being clinically dissected cannot be denied[ as] this was a trial for [capital] murder." *Dawkins*, 557 S.W.3d at 606. These photographs depict nothing more than the reality of the crime committed by Rojas. *See Chamberlain*, 998 S.W.2d at 237 ("The photographs are gruesome in that they depict disagreeable realities, but they depict nothing more than the reality of the brutal crime committed."); *Williams*, 301 S.W.3d at 691, 693 (finding no error in admission of photographs which "portray no more than the gruesomeness of the injuries inflicted by appellant"); *Paredes v. State*, 129 S.W.3d 530, 540 (Tex. Crim. App. 2004) ("[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence.") (quoting *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App.1995)). "Jurors are constitutionally called to assess the guilt or innocence of their peers, and images of death and tragedy are par for the course." *Dawkins*, 557 S.W.3d at 606. We presume that such photographs are admissible, and they can only be excluded if their "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the

19

issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. We find that the challenged photographs assisted the jury in understanding the medical testimony about J.C.'s autopsy, deciding the credibility of such witnesses, and helped the jury to assess the severity and extent of his injuries, as well as the circumstances surrounding his death. *See Chamberlain*, 998 S.W.2d at 237; *Drew*, 76 S.W.3d at 452.

After considering the factors discussed above, we hold that the probative value of the complained-of photographs was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. Therefore, the trial court did not abuse its discretion when it admitted the photographs into evidence. *See Inthalangsy*, 634 S.W.3d at 754. Rojas's second issue is overruled.

## IV.   INEFFECTIVE ASSISTANCE OF COUNSEL

### A.   Standard of Review and Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "An appellate court looks to the totality of the representation and the particular circumstances of each case in evaluating the effectiveness of counsel." *Lynch v. State*, 318 S.W.3d 902, 904 (Tex. App.—San Antonio 2010, pet. ref'd) (citing *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)). "[A] person claiming ineffective assistance of counsel must show that (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense." *Ex parte Covarrubias*, 665 S.W.3d 605, 609 (Tex. Crim. App. 2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

20

To satisfy the first prong, deficiency is established by "showing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, considering the facts of the case viewed from counsel's perspective at the time of the representation." *Ex parte Garza*, 620 S.W.3d 801, 808–09 (Tex. Crim. App. 2021). The Texas Court of Criminal Appeals has routinely held that "claims of ineffective assistance of counsel are generally not successful on direct appeal and are more appropriately urged in a hearing on an application for a writ of habeas corpus." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). "On direct appeal, the record is usually inadequately developed and 'cannot adequately reflect the failings of trial counsel' for an appellate court 'to fairly evaluate the merits of such a serious allegation.'" *Id.* (quoting *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002)). In the absence of an explanation in the record for why counsel's conduct allegedly fell below this objective standard, we will "assume a strategic motivation if any can possibly be imagined" and not conclude that the challenged conduct constituted deficient performance unless the conduct was "so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see Ex parte Westerman*, 570 S.W.3d 731, 731 n.1 (Tex. Crim. App. 2019).

The appellant bears the burden to prove ineffective assistance of counsel by a preponderance of the evidence. *Lynch*, 318 S.W.3d at 904; *Perez v. State*, 689 S.W.3d 369, 381 (Tex. App.—Corpus Christi–Edinburg 2024, no pet.). We employ a strong presumption that counsel's conduct fell within the wide range of reasonable, professional assistance and that it was motivated by a sound trial strategy. *Strickland*, 466 U.S. at 689; *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023). The presumption of a sound

21

trial strategy generally cannot be overcome absent evidence in the record of the attorney's reasons for his conduct. *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007) ("The lack of a clear record usually will prevent the appellant from meeting the first part of the *Strickland* test."); *Davis v. State*, 533 S.W.3d 498, 510 (Tex. App.—Corpus Christi–Edinburg 2017, pet. ref'd). If there is any basis for concluding that counsel's conduct was strategic, then further inquiry is improper. *Lopez*, 343 S.W.3d at 143. We consider "the reasonableness of counsel's actions at the time, rather than viewing such actions through the benefit of hindsight." *Hart*, 667 S.W.3d at 782.

To establish prejudice under the second prong, the appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other prong." *Williams*, 301 S.W.3d at 687. Accordingly, failure to make a showing under either *Strickland* prong defeats a claim for ineffective assistance. *Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) (citing *Thompson*, 9 S.W.3d at 813).

## B.    Analysis

Rojas specifically complains that his trial counsel failed to object to State's Exhibits 130 through 166.[4] In this regard, Rojas complains that his trial counsel "failed to object to a series of photographs that were obviously as inflammatory and unfairly prejudicial"

---

[4] In his brief, Rojas argues that his trial counsel failed to object to the admission of State's Exhibits 130 through 134 and 134 through 175. However, the record demonstrates that Rojas's trial counsel did object to State's Exhibits 167 through 175 as discussed in his second issue. Therefore, we only address the unobjected-to photographs under his ineffective assistance of counsel claim.

22

as the autopsy photographs. For the reasons detailed below, and in the face of this silent record, we conclude that Rojas's trial counsel's failure to object was not "so outrageous that no competent attorney would have engaged in it." *Garcia*, 57 S.W.3d at 440.

As discussed supra, Rule 403 provides that the trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403; *see also id.* R. 401. Like the other photographs discussed above, we conclude the unobjected-to photographs are probative because they showed the true nature of J.C.'s injuries, which aided the jury in determining the cause of said injuries and the credibility of Rojas's statements to I.G. and law enforcement. *See Williams*, 301 S.W.3d at 692; *Gallo*, 239 S.W.3d at 763. Having concluded the probative nature of the photographs, we now assess whether the trial court would have erred in admitting the photographs over Rojas's objections had he asserted any objections. Therefore, we turn to the Gallo factors in assessing the prejudicial effect of the complained-of photographs. *See Gallo*, 239 S.W.3d at 762.

The complained-of photographs are in color and were introduced in conjunction with the testimonies of the State's medical witnesses. The first couple of photographs depict J.C.'s body as he presented to TCH, showing bruising, abrasions, and medical equipment. The next few photographs depict the condition of J.C.'s body as received by the medical examiner's office. In these photographs, he was both clothed and unclothed. While some of these photographs showed medical intervention, such as an IV, tape, and a neck brace, none of them illustrate organ or skull dissection as seen in the autopsy photographs. Most of the photographs showed the same parts of J.C.'s body at multiple

23

angles and distances. They also show J.C.'s injuries including bruises and abrasions, which tended to prove that his head trauma could not have been accidental. *See Dawkins*, 557 S.W.3d at 606. The photographs are also probative in light of Ecby's, Sarpong's, and Jarvis's testimonies. The State offered their testimony and established their qualifications and credibility, and these photographs were explained by them in detail. The photographs at issue confirmed the appearance of J.C. in the hospital, that medical procedures and surgical intervention were performed, and allowed the jury to assess the extent of J.C.'s injuries as well as judge the credibility of the medical testimony for themselves. *See Chamberlain*, 998 S.W.2d at 237; *Drew*, 76 S.W.3d at 452. In light of credibility considerations, the additional probative value of these photographs weighs in favor of admissibility. *See* TEX. R. EVID. 403

Although some of the photographs offered by the State depicted aspects of J.C.'s case that would ordinarily be considered gruesome, they depict nothing more than the nature of the capital murder committed by Rojas. *See Chamberlain*, 998 S.W.2d at 237; *Williams*, 301 S.W.3d at 691, 693; *Paredes*, 129 S.W.3d at 540. We again note that "[j]urors are constitutionally called to assess the guilt or innocence of their peers, and images of death and tragedy are par for the course." *Dawkins*, 557 S.W.3d at 606. We presume that such photographs are admissible, and they can only be excluded if their "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403. For the foregoing reasons, that is not the case here. We find that the challenged photographs assisted the jury in understanding the medical testimony concerning J.C.'s hospital appearance, medical intervention, and

presentation to the medical examiner's office, deciding on the credibility of such witnesses, and helped the jury to assess the circumstances, severity, and extent of his injuries, medical intervention, and death. *See Chamberlain*, 998 S.W.2d at 237; *Drew*, 76 S.W.3d at 452.

Accordingly, the probative value of the State's Exhibits was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. The trial court would not have abused its discretion in overruling an objection, even if Rojas's counsel had made one. *See Inthalangsy*, 634 S.W.3d at 754. Thus, his trial counsel was not ineffective for failing to object to the photographs. *See Vasquez v. State*, 2 S.W.3d 355, 360 (Tex. App.—San Antonio 1999, pet. ref'd) (holding because the probative value of certain photographs was not outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion in admitting the photographs and trial counsel was not ineffective for failing to object). Rojas's third issue is overruled.

## V.    CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
30th day of April, 2026.

25